**Timothy DOE and Peter Doe,
Plaintiffs,**

**v.**

**Gregory ANRIG, et al., Defendants.**

**Civ. A. No. 81–1731–T.**

United States District Court,
D. Massachusetts.

Jan. 15, 1987.

Norah M. Wylie, Paul G. Gitlin, Boston, Mass., Gitlin, Emmer & Kaplan, for plaintiffs.

Cathleen Cavell, Brookline, Mass., for Town of Brookline.

Office of the Atty. Gen., Michael Broad, Boston, Mass., William Pardee, Asst. Atty. Gen., for Gregory Anrig-defendant.

## MEMORANDUM

TAURO, District Judge.

This is an appeal brought pursuant to the Education of the Handicapped Act, 20 U.S.C. § 1401 et seq. Plaintiff Peter Doe seeks review of a final administrative order denying reimbursement for costs he incurred while his son, plaintiff Timothy Doe, was undergoing treatment for a serious mental illness.

## I

■ The Education of the Handicapped Act is a federal funding statute designed to assist state and local agencies in educating handicapped children. *See generally Hendrick Hudson Dist. Bd. of Ed. v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). To qualify for federal financial assistance, a state must have in effect "a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). Local school officials, the child's parents and, when appropriate, the child, create an individualized educational program (IEP) to insure that the specific needs of the child are met. 20 U.S.C. § 1401(19).

■ The Act affords parents extensive procedural protections. 20 U.S.C. § 1415. They may challenge the adequacy of the IEP proposed by the school district in state administrative proceedings and, ultimately, in federal district court. 20 U.S.C. § 1415. Moreover, parents may be entitled to reimbursement if required to provide appropriate educational services at their own expense. *Town of Burlington v. Mass. Dep't of Ed.,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

Massachusetts participates in the federal funding scheme by having in place a special education law that meets or exceeds the requirements of the federal Act. Mass. Gen.L. ch. 71B § 1 et seq. This court is obliged to enforce, under the federal Act, Massachusetts special education law that is consistent with the federal program. *Town of Burlington v. Mass. Dep't of Ed.,* 736 F.2d 773, 784–85 (1st Cir.1984), *aff'd on other grounds,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

## II

In September 1973, when Timothy was 12, his parents were divorced.[1] The divorce decree granted Timothy's mother, Jane Doe, sole legal custody of Timothy. Timothy's father, Peter Doe, retained responsibility for his son's educational expenses. The terms of this decree did not change throughout the period relevant to this appeal.

Timothy attended the Wellesley, Massachusetts public schools, until he completed the ninth grade in June 1976. Sometime before age 14, Timothy began to abuse illicit drugs. During the academic year beginning in the fall of 1976, Timothy attended two private schools. His attendance at those institutions was undermined by his continued abuse of drugs. In the spring of 1977, after Timothy was excluded from his father's home in Cambridge, he went to live with his mother in Brookline.

In the fall of 1977, Timothy's teachers became concerned about his occasionally bizarre behavior. He told a school counselor that he was "hearing voices." On November 3, 1977, Timothy was voluntarily admitted to McLean Hospital, a private psychiatric hospital in Belmont, Massachusetts. At the time he was admitted, the supervising psychiatrist concluded that Timothy was "clearly psychotic" and seemed "unable to perform in school." Initially, Timothy was not treated with medication. He became increasingly overwhelmed and assaultive on several occasions, however, and required seclusion and treatment with "fairly high doses" of Thorazine. Thorazine seemed to leave Timothy in better control.

Shortly after Timothy's admission to McLean, Jane Doe contacted the Brookline public schools and requested an evaluation of her son's special education needs. Brookline considered Timothy to come within the section 502.7(a) prototype[2]

---

1. Unless otherwise noted, the following statement of facts is culled from the parties' stipulations. *See* Administrative Record ("AR") Vol. 1, B–15.

2. Massachusetts school districts deliver special education services through prototypes. *See* 603 C.M.R. § 502. The 502.7(a) prototype provides for instruction in the child's home or in a hospital when in the judgment of the child's physician the child cannot attend school. This program is appropriate only when the child will be out of school not less than fourteen days but no more than sixty days. Under the 502.7(a) prototype school officials need not devise an IEP for

whereby Brookline would provide tutoring to Timothy while he remained at McLean. After evaluations were conducted, tutoring began on January 10, 1978.

Timothy's treatment at McLean also included individual psychotherapy, (provided by Richard Bonier, Ph.D.) group therapy, medication, and physical education. Substantial disagreement existed between Peter Doe and the McLean psychiatrists. Peter Doe, a clinical psychologist, disagreed with the psychiatrists' diagnoses, and with the use of medication. Dr. James, the supervising psychiatrist, wanted to transfer Timothy to a "long term treatment hall" that apparently would have entailed the continued use of medication. On January 19, 1978, at his father's urging, Timothy left McLean against medical advice.

Timothy went to live with his father in Cambridge upon his discharge from McLean. By agreement with his father, Timothy stopped taking his medication. Unfortunately, it appears that he continued to abuse illicit drugs. On April 28, 1978 Timothy was admitted to the Glenside Hospital after his condition had worsened considerably. He was initially diagnosed as suffering from a schizophrenic reaction.

Timothy remained at Glenside only two weeks before he was transferred to McLean on May 15, 1978. Upon his readmission to McLean, Timothy was provisionally diagnosed as a "chronic schizophrenic, undifferentiated type." Timothy's behavior was physically self-destructive, and he was placed on large doses of Thorazine. Timothy's condition improved during June 1978 and he participated in a one-on-one math tutorial in the summer session of the Arlington School. The Arlington School is a state certified special education facility administered by McLean and located on the hospital grounds. Evaluations conducted in July 1978 showed that Timothy was not yet able to benefit from physical education or psychomotor therapy.

On September 8, the psychiatrist in charge of Timothy's unit informed the Brookline Special Education Administrator that Timothy was suffering from

> a severe mental illness characterized by auditory hallucinations, delusional thinking, self-destructive behavior and poly drug abuse [which] would make it, in my opinion, impossible for him to receive an education in a regular classroom. He is in need of the hospital for treatment of his illness. We have a high school located on the grounds of the hospital where, in addition, he can receive an education.

A.R. Vol. II, S–3. After receiving Timothy's psychological report, hospital record, and medical history, Brookline school officials met on September 18, 1978. Timothy's mother attended this meeting. Peter Doe did not receive notice of the meeting and did not attend. This meeting produced an IEP, signed by Jane Doe, for the period September 18 through November 30, 1978. The IEP called for physical education and tutoring in music.

A review meeting was scheduled for November 27, 1978. Again, Brookline did not notify Peter Doe and he did not attend. This meeting produced a second IEP that was signed by Jane Doe. The second IEP continued Timothy's tutoring in basketball and music, and added weightlifting tutoring. Although not listed in the IEP, it appears that Brookline also provided a woodworking class to Timothy.

By letter dated February 16, 1979, Peter Doe withdrew his approval for Timothy's continued hospitalization at McLean.[3] Timothy was discharged on February 20 against medical advice. At that time his diagnosis was "schizophrenic, chronic, undifferentiated type, improved."

---

the child. The 502.7(b) prototype is used when in the physician's judgment the child must stay at home or in the hospital for more than sixty days. In the 502.7(b) prototype the school district must create an IEP for the child.

3. On October 8, 1978 Timothy executed a power of attorney in favor of his father as to all matters relating to his treatment. Peter Doe never informed Brookline of the existence of this power of attorney, and there is no indication that Brookline was informed through other channels.

Timothy again went to live with his father in Cambridge. Once again Timothy's condition deteriorated. On April 19, 1979 he was admitted to the Human Resource Institute (HRI). In September 1979, Timothy was discharged to the Farm Collaborative in Carlisle, Massachusetts. During the remaining period relevant to this appeal, Timothy spent time at both HRI and the Farm Collaborative.

In November 1979 Peter Doe notified Brookline that the divorce decree had been modified to grant the father joint custody of Timothy. In July 1980 the father rejected the two IEPs prepared and implemented by Brookline. Peter Doe then initiated proceedings to recover $113,518.82. This sum represents Peter Doe's total costs for services rendered to Timothy from November 1977 to November 1979.

In April 1981, the Bureau of Special Education Appeals (BSEA) dismissed Peter Doe's suit on the ground that Peter Doe had no "standing" to challenge the education program devised and implemented by Brookline. The BSEA reasoned that a divorced, non-custodial parent had no legal authority to accept or reject an IEP. On appeal, this court remanded for a determination as to whether Brookline had provided Timothy with a free appropriate education. This court retained jurisdiction over the case pending any future appeal. On remand the BSEA concluded that:

1. Brookline was justified in relying on Jane Doe's acceptance of the IEPs.

2. Peter Doe was dilatory in seeking reimbursement.

3. Based on Timothy's residence, Brookline had responsibility for him only from November 1977 until January 19, 1978.

4. The expenses for which Peter Doe seeks reimbursement are not compensable under federal or state law.

5. The IEPs prepared by Brookline were adequate. Peter Doe contests all of these findings. The court will consider each in turn.

III

■  The BSEA ruled that Brookline was justified in relying on Jane Doe's acceptance of the IEPs. Resolution of this issue depends on Peter Doe's rights under the Education of the Handicapped Act, 20 U.S.C. § 1401 et seq., and under the Massachusetts Comprehensive Special Education Law, Mass.Gen.L. ch. 71B, § 1 et seq.

The parties vigorously dispute Peter Doe's right to bring an action seeking reimbursement for his expenses. Defendants argue that a non-custodial parent has no right to be involved in the IEP process. Their rationale is that the non-custodial parent is without legal authority to accept or reject an IEP, and that school districts ought not get caught in the middle of warring divorcees.

Applicable special education law does not provide a direct answer to this question. Massachusetts law grants "parents, guardians, or persons with custody" the right to notice of the IEP proceedings and the right to seek review of an IEP. Mass.Gen.L. ch. 71B, § 3. Massachusetts regulations define parent as "father or mother, guardian, person acting as a parent of the child, or surrogate parent who has been appointed in accordance with Division procedures." 603 C.M.R. § 113.0. These provisions do not address the rights of a divorced, non-custodial parent.

Federal law addressing procedural safeguards speaks in terms of the "parents or guardian." 20 U.S.C. § 1415. Applicable federal regulations define parent as "a parent, a guardian, a person acting as a parent of the child, or a surrogate parent." 34 C.F.R. § 300.10. As with state law, federal law does not speak to the rights of a divorced, non-custodial parent.

The court concludes that, under the Education of the Handicapped Act, Brookline improperly excluded Peter Doe from participating in his son's educational planning. Several factors support this conclusion. First, absent a restraining order from the state court, a parent's right to be involved in his child's educational planning and progress is basic, even in the event of

divorce. Second, federal law unequivocally mandates extensive parental involvement. 20 U.S.C. § 1415; *Town of Burlington v. Mass. Dep't of Ed.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Finally, pursuant to the terms of the Doe's divorce decree, Peter Doe had a continuing financial responsibility for his son's educational expenses. It would be imprudent to permit an educational program to be devised without consulting the party responsible for a child's overall education.

Because of its failure to notify Peter Doe, Brookline could not properly rely on Jane Doe's acceptance of the IEPs. The court is not faced with a situation where the non-custodial parent, once properly notified by the school district, refuses to participate, or is unable to agree with the custodial parent on the merits of a particular IEP. Under those circumstances, a school district might be justified in relying on the custodial spouse's acceptance of an IEP. Here, however, Peter Doe never had an opportunity to be heard with respect to the future of his son.

## IV

■ The BSEA denied Peter Doe reimbursement, because he was dilatory in asserting his rights under state law. Peter Doe rejected the IEPs 18 months after the final IEP expired and more than eight months after the last date for which Peter Doe seeks reimbursement. The hearing officer relied on a Massachusetts regulation that authorizes reimbursement "retroactive to the date the inadequate IEP was rejected by the parent or could reasonably have been expected by the parent." 603 C.M.R. § 504.5(f).

Had Brookline properly notified Peter Doe and informed him of his rights, this court would uphold the BSEA on the basis of this regulation. It is undisputed, however, that Brookline made no attempt to involve Peter Doe in the IEP process. Since Brookline failed to notify Peter Doe, neither it nor the State may rely on the timing constraints of 603 C.M.R. § 504.5(f). *See Town of Burlington v. Mass. Dep't of*

*Ed.*, 736 F.2d 773, 782–83 (1st Cir.1984), *aff'd on other grounds*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

## V

■ The hearing officer found, based on Timothy's actual residence, that Brookline had responsibility for Timothy only until January 19, 1978. This is the date on which Timothy left McLean for the first time and went to live with his father in Cambridge. Alternatively, the hearing officer found that, if Brookline assumed responsibility for Timothy's special education during his second McLean stay, then its responsibility finally ended on February 20, 1979. This is the date of Timothy's final discharge from McLean and the resumption of his residence in Cambridge.

Peter Doe contends that the proper criterion for a school district's responsibility is a child's legal residence, not his actual residence. Given that Timothy's custodial parent, Jane Doe, resides in Brookline, Peter Doe argues that her residence must also be that of her son, unless Timothy's move was accompanied by an intention to change his legal residence. Peter Doe contends, therefore, that Brookline was responsible for the entire period of Timothy's treatment.

Federal law does not address this issue. Applicable Massachusetts law states that "every city, town, or school district shall identify the school age children residing therein who have special needs." Mass. Gen.L. ch. 71B, § 3. Regulations promulgated pursuant to section 3 require school districts to fulfill all the requirements of the Comprehensive Special Education Law for "[c]hildren who live ... in a hospital ... where the father, mother, or guardian with whom such child lives when at home lives in the city, town, or school district over which such school committee has jurisdiction." 603 C.M.R. § 202.1(c). The hearing officer found that, after January 19, 1978, Timothy lived with his father in Cambridge when not admitted to a hospital.

The court agrees with the BSEA that school districts are responsible for children who actually reside in their districts. The

controlling word in the statute is "reside", and that of the regulation is "live". These words are consistent with a standard of responsibility based on the physical location of the child. If the legislature or the Department of Education had intended legal residence, rather than physical presence, to be determinative, they would have said so.

Brookline's legal responsibility did not end on January 19, 1978. Brookline is also responsible for Tim's special education during a portion of his second stay at McLean, having assumed that responsibility by planning and implementing two IEPs during this period. Those programs effectively preempted either parent from seeking educational services from a different school system.

## VI

■ The hearing officer held that Peter Doe is not entitled to reimbursement for room and board expenses at McLean Hospital, because that institution is not a state approved special education facility. The hearing officer further concluded that Timothy required psychiatric hospitalization, not placement in a certified special education facility.

Under Massachusetts regulations, school districts may place children only in certified special education facilities. 603 C.M.R. § 504.2(b)(iv). Similarly, applicable regulations provide that the BSEA hearing officer may not specify a residential school program for a child, unless the program is certified. 603 C.M.R. § 403.2.

McLean Hospital is not a state certified special education facility.[4] The court concludes, therefore, that Peter Doe is not entitled to reimbursement for the cost of room and board at McLean Hospital.

The court also agrees with the hearing officer's conclusion that no state approved program would have been suitable for Timothy. Kenneth R. McElheny, Dean of the Arlington School at McLean Hospital, testified that he was familiar with the range of certified residential facilities. Dean McElheny concluded that Timothy "was too disturbed, too disruptive. He could not have been contained by them. He needed a more restrictive residential program, namely, a hospital." AR Vol. III, pt. I, p. 209. Dr. Bonier, Timothy's psychotherapist, came to the same conclusion. AR Vol. III, pt. II, p. 175. *See also* AR Vol. II, P–50 and P–120B.

## VII

■ The BSEA denied Peter Doe reimbursement for the costs of individual psychotherapy and group therapy provided at McLean Hospital. The hearing officer concluded that these services were not sufficiently related to Timothy's special education to be compensable as "related services" within the meaning of federal or state law. *See* 20 U.S.C. § 1401(17) and 603 C.M.R. § 503, discussed *infra*.[5] The hearing officer reasoned as follows:

Tim's education was plainly not a central or primary focus of his psychotherapy. Quite frankly it strains all credibility to contend that the purpose of Tim's psychotherapy with Dr. Bonier was to enable Tim to benefit from his educational tutoring. The pervasiveness of Tim's mental illness, his medical/chemical/psychiatric problems and greatly diminished ability to function and deal with reality in general relegated his educational needs to a minor component during this period.

Decision at 15. Two assumptions are implicit in the hearing officer's conclusions. First, related services must be primarily

4. The Arlington School, a subunit of McLean, is certified. Timothy's enrollment in the Arlington School is discussed *infra* at footnote 8.

5. Other services rendered to Timothy at McLean generated considerable confusion during the administrative hearing. In many instances it is unclear whether Brookline or McLean staff provided the service. In other cases plaintiffs have not sufficiently described the service to enable the court to determine whether Peter Doe is entitled to reimbursement. The plaintiffs did not seek to introduce additional evidence before this court.

for educational purposes. Second, Timothy was so ill that education was not a serious consideration in his case.

The definition of related services is similar under federal and Massachusetts special education laws. Both schemes define related services as those "required to assist a handicapped child to benefit from special education." 20 U.S.C. § 1401(17) and 603 C.M.R. § 503. Massachusetts regulations add that the service must be "directly related to the achievement of the short and long term educational objectives specified in the IEP." 603 C.M.R. § 503.1. Under both schemes, related services may include services provided by a psychologist.[6] 34 C.F.R. § 300.13 and 603 C.M.R. § 503.1.

Neither federal nor state law requires that the related service be "primarily" for educational purposes. Rather, the service need only be "required to assist the child to benefit from special education". In *Irving Ind. Sch. Dist. v. Tatro*, 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984), the Court held that clean intermittent catheterization ("CIC") was a related service. CIC is a process that empties the bladder of a person unable to do so naturally. The child in *Tatro* would have been unable to remain in the regular public school classroom unless this process was provided. Although CIC was "required to assist the child to benefit from special education," the primary purpose of the procedure certainly was not educational.

Although Timothy's illness was severe and pervasive, there is no evidence that he was uneducable. Brookline prepared and implemented two IEPs for him. While their educational goals were modest, education for profoundly handicapped children may of necessity involve the most fundamental and basic skills. *Abrahamson v. Hershman*, 701 F.2d 223, 228 (1st Cir. 1983).

The goals stated in the September 18, 1978 IEP were: "To build positive self-es-teem through building competence in skill areas of interest: (music, physical education). To build ability to control behavior appropriately in small, structured group activity and lesson [sic]." The IEP covering the period December 1978 to February 26, 1979 stated the same goals.

Dr. Bonier, the administering psychotherapist, described his therapeutic goals for Timothy. Dr. Bonier testified:

A. ... [W]hat I was trying to do in the psychotherapy aspect of his treatment was to work around the areas of emotional charge as much as possible.... to try a desensitization so that he could gradually begin to use words, applied in the areas of high emotional charge and to deal, begin to deal more cognitively with those areas ...

\* \* \* \* \* \*

Q. And to the extent to which this kind of approach would be successful with [Tim], would it ... improve his ability to participate in, for example, group activities?

A. That was the intent, yes.

Q. Would it also to the extent to which it was successful improve [Tim's] abilities to work, say in a one to one learning relationship, say, with a tutor, whether he is working with a basketball tutor or woodworking tutor?

A. Again, that was the intent.

AR Vol. III, pt. II, p. 151–2.

Based on Dr. Bonier's testimony, and on the goals stated in the IEPs, the court finds that psychotherapy and group therapy were required to assist Timothy to benefit from special education. They were, therefore, related services under federal and state law.

The next stage of inquiry is whether Brookline was required to provide these services. Under Massachusetts law, a school district is obligated to provide services that assure a child's maximum feasi-

**6.** The definition of related services under federal law authorizes medical services only for diagnostic and evaluation purposes. 20 U.S.C. § 1401(17). Dr. Bonier, Timothy's psychothera-pist, is a psychologist. His services, therefore, are not medical, and so the medical services limitation does not apply.

ble development.[7] *David D. v. Dartmouth School Committee*, 775 F.2d 411, 423 (1st Cir.1985). This court holds that, under Massachusetts law, Brookline was obligated to provide these services to Timothy.

Peter Doe spent $6,225 on psychotherapy and group therapy while Timothy was at McLean Hospital.[8] AR Vol. II, P–123. Brookline must reimburse Peter Doe for this expenditure.

---

**7.** The level of substantive benefit required under federal law is considerably more modest. *Hendrick Hudson Bd. of Ed. v. Rowley*, 458 U.S. 176, 203, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982) (Free appropriate public education means "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.") Since the court finds that Brookline was obligated to provide these services under state law, there is no need to consider the less demanding federal standard.

**8.** This figure represents Peter Doe's expenditure for psychotherapy and group therapy during Timothy's first stay at McLean (November 1977 to January 19, 1978) and a portion of his second stay, from August 1978 through February 20, 1979. As discussed in part V, *supra*, the court finds Brookline responsible for Timothy's special education during his second McLean stay only from the time it began to provide those services. Although Timothy's second stay at McLean began in May 1978, Brookline did not undertake to provide special education services to him until August 1978.

Timothy attended the 1978 summer session at the Arlington School during his second stay at McLean. Tuition for the session was $435. Brookline is not responsible for this expense because Brookline had not begun to provide services to Timothy at the time he attended the Arlington School.