910 F.2d 627
 62 Ed. Law Rep. 78
 Todd TAYLOR, a minor, By and Through his Guardians ad litem,
Andrea and Byron TAYLOR; Byron Taylor on his own
behalf; Andrea Taylor on her own
behalf; Plaintiffs-Appellees,
v.
Bill HONIG, in his official capacity as Superintendent of
Public Instruction, Defendant,
and
Garden Grove Unified School District; Board of Education of
the Garden Grove Unified School District,
Defendants-Appellants.
 No. 89-55177.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 11, 1989.
Decided Aug. 7, 1990.
 
 Spencer E. Covert, Jr., Parker and Covert, Santa Ana, Cal., and Ronald D. Wenkart, Orange County Dept. of Educ., Costa Mesa, Cal., for defendants-appellants.
 Joan K. Honeycutt, Tustin, Cal., for plaintiffs-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before SCHROEDER and BEEZER, Circuit Judges, and KING,* District Judge.
 SCHROEDER, Circuit Judge:
 
 INTRODUCTION
 
 1
 The Education for All Handicapped Children Act of 1975 ("EHA"), 20 U.S.C. Secs. 1400 et seq. (1988), has spawned a great deal of significant litigation around the country concerning its applicability to children who are so severely handicapped that they can only receive adequate educational and medical care in residential placement outside the home.[1] This appeal is part of that litigation. Here the district court entered a preliminary injunction ordering a severely emotionally disturbed child to be placed in San Marcos Treatment Center, a residential facility in Texas operating under appropriate state authorization in a dual capacity as a school and as a psychiatric hospital. Garden Grove School District ("School District"), the local educational agency responsible under the EHA for providing a free appropriate public education for the child, appeals.
 
 
 2
 The key issue is whether the district court erred in its holding that the Taylors had a substantial likelihood of success in their claim that San Marcos, a Brown School,[2] is an appropriate placement under 34 C.F.R. Sec. 300.302 (1989) which expressly authorizes residential placements, in the face of the School District's contention that the institution is a hospital and as such is excluded by statute as an excluded medical service. 20 U.S.C. Sec. 1401(a)(17) (1988).
 
 
 3
 In light of recent circuit decisions holding that placements in similar institutions are appropriate under the EHA, we uphold the district court's injunction. See, e.g., Jefferson County Board of Education v. Breen, 853 F.2d 853, 857 (11th Cir.1988) (school district required to pay for handicapped child's placement at the Ranch, a Brown School); Clevenger v. Oak Ridge School Board, 744 F.2d 514, 516-17 (6th Cir.1984) (school district required to pay for placement at San Marcos).
 
 
 4
 The statutory scheme and the needs of severely handicapped children are complex. Recognizing this, the district court specifically reserved for subsequent consideration the appropriateness of separating the costs of the different services rendered by San Marcos so that the School District would not have to foot the entire bill of the institutional care, including those costs representing medical services as opposed to educationally related services. See, e.g., Drew P. v. Clarke County School Dist., 877 F.2d 927, 929 (11th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1510, 108 L.Ed.2d 646 (1990) (costs of residential placement apportioned between school district and parents); Doe v. Anrig, 651 F.Supp. 424, 430-32 (D.Mass.1987) (court apportioned costs of placement between school district and father). The district court also reserved for final determination the issue of whether some other institution is a more appropriate ultimate placement for this child.
 
 
 5
 Our affirmance is with the express recognition and approval of these provisions in an injunction which is necessary to ensure that the child does not lose education mandated by the EHA. See Los Angeles Memorial Coliseum Com'n v. National Football League, 634 F.2d 1197, 1200 (9th Cir.1980) (purpose of preliminary injunction is to preserve status quo ante litem pending determination on the merits). An injunction is particularly appropriate in this case because, as we have held, injunctive or other prospective relief is ordinarily the remedy under the EHA and damages are usually inappropriate. Mountain View-Los Altos Union High School District v. Sharron B.H., 709 F.2d 28, 30 (9th Cir.1983) (relying on Anderson v. Thompson, 658 F.2d 1205, 1210-11 (7th Cir.1981)); see, e.g., Department of Education State of Hawaii v. Katherine D., 727 F.2d 809, 816-17 (9th Cir.1983), cert. denied, 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 260 (1985) (relying on Anderson, 658 F.2d at 1210-11).
 
 LEGAL AND FACTUAL BACKGROUND
 
 6
 In our recent decision, Clovis United School District v. California Office of Administrative Hearings, et al., 903 F.2d 635, 638-39 (9th Cir.1990), we summarized the EHA statutory scheme as follows:
 
 
 7
 The [EHA], 20 U.S.C. Secs. 1400 et seq., provides funds and also regulates state assistance to handicapped students. [Katherine D., 727 F.2d at 813]. To qualify for federal assistance for special education programs, a state must have in effect a policy that assures all handicapped children the right to a 'free appropriate public education.' 20 U.S.C. Sec. 1412(1). The state must adopt policies and procedures which assure that all children receive an appropriate education 'regardless of the severity of their handicap.' 20 U.S.C. Sec. 1412(2)(c).
 
 
 8
 The term 'free appropriate public education' is defined to include 'special education' and 'related services.' 20 U.S.C. Sec. 1401(a)(18). 'Related services' in turn are defined by the statute as [T]ransportation and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only ) as may be required to assist a handicapped child to benefit from special education.... (emphasis added) 20 U.S.C. Sec. 1401(a)(17).[3] The Act contains no explicit definition of 'medical services.'
 
 
 9
 The EHA indirectly requires school districts to provide residential placements by defining elementary and secondary schools to include 'residential schools.' 20 U.S.C. Sec. 1401(a)(9) and (10). There is no further explanation in the Act, but the pertinent regulations provide that '[i]f placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care and room and board, must be at no cost to the parents of the child.' 34 C.F.R. Sec. 300.302.
 
 
 10
 Under the Act an Individualized Educational Program (IEP) must be developed for each handicapped child. 20 U.S.C. Sec. 1401(a)(18). The program is developed by representatives of the educational agency, the teacher, the parents or guardians of the child, and when appropriate, the child. 20 U.S.C. Sec. 1401(a)(19).
 
 
 11
 Todd Taylor is a seriously emotionally disturbed youth who is entitled to special education and related services under the EHA, 20 U.S.C. Secs. 1400 et seq. At the time of this appeal he was seventeen years old. Garden Grove Unified School District is a recipient of federal financial assistance and is the local educational agency responsible for providing Todd with a free appropriate education under the EHA. In September 1986, the School District referred Todd to defendant Orange County Health Care Agency ("County Mental Health") for mental health services pursuant to Cal.Gov.Code Sec. 7572. An IEP was developed and Todd was placed in a special education school, at public expense, with psychotherapy and the prescription and monitoring of medication provided by County Mental Health as an adjunct. This arrangement failed and Todd was ultimately arrested for physical aggression against his family. He spent a total of approximately two months in juvenile hall between March 30, 1987 and September 13, 1987.
 
 
 12
 Meanwhile, in September 1987, Todd's mother contacted the School District and requested a new IEP meeting to determine an appropriate residential placement for Todd, as the previous placement had failed. The IEP team met on October 8, 1987 and determined that Todd required placement in an appropriate therapeutic milieu as soon as possible. A week later, Todd was released by the Probation Department for placement in coordination with County Mental Health. Unfortunately, no placement was identified and Todd spent an additional six months in juvenile hall, where his condition deteriorated. Ultimately, he was transferred from juvenile hall to the Adolescent Psychiatric Unit of the University of California at Irvine Medical Center.
 
 
 13
 Additional IEP meetings were convened in March and May of 1988. On May 9, 1988 an IEP was developed which stated that Todd was medically stable, that he required a long-term residential placement when released from the Irvine Medical Center, and that a state hospital was not an appropriate placement for him. Notwithstanding this evaluation, County Mental Health was appointed as a temporary conservator and removed Todd from Irvine Medical Center and transferred him to Camarillo State Hospital.
 
 
 14
 On June 29, 1988 Todd's parents were appointed co-conservators. A few days later, the parents requested an emergency IEP meeting to select an appropriate residential placement for Todd. The special education director for the School District denied this request. In accordance with 20 U.S.C. Sec. 1415(b)(2) and Cal.Educ.Code Secs. 56501 and 56502, the Taylors requested a due process hearing which was convened on August 30, 1988. Meanwhile, on September 28, 1988, the Taylors removed Todd from Camarillo State Hospital and placed him once again in Irvine Medical Center. Todd was released from Irvine Medical Center on November 10, 1988 when his parents' insurance coverage for the year was exhausted. He remained at home and received outpatient treatment from Irvine Medical Center until January 10, 1989.
 
 
 15
 On December 8, 1988, the hearing officer issued a final decision. He found that Todd's "social, emotional, medical and educational needs are not severable and are intertwined," and ordered that Todd be placed in a 24-hour residential facility that would provide the following:
 
 
 16
 (i) an on-site school program to forestall truancy;
 
 
 17
 (ii) a program of structured activities throughout the day and evening that will encourage social interaction in therapy sessions and classroom discussions;
 
 
 18
 (iii) psychotherapy including individual, group and family sessions to address Todd's depression, "which has adversely affected his educational performance, including his social withdrawal and non-participation in classroom discussion";
 
 
 19
 (iv) a psychiatrist on call, but not necessarily on duty, to prescribe and monitor the amount of anti-depressant medication required by Todd;
 
 
 20
 (v) a nurse on the premises of the placement to check Todd's somatic complaints; and
 
 
 21
 (vi) a "responsible adult" to administer Todd's medication;
 
 
 22
 After the hearing officer's decision, the IEP team met four times in late December 1988 and early January 1989. At these meetings, County Mental Health proposed five placements for Todd. These placements were all rejected as being either unavailable or unable to provide the level of care ordered by the hearing officer. At the first of these meetings, the Taylors proposed San Marcos Treatment Center. The School District and County Mental Health representatives rejected this proposal.
 
 
 23
 On January 10, 1989 Todd was again placed at Irvine Medical Center because of psychological regression which culminated in an attack against his father. The Taylors' insurance, which provides for 45 days of inpatient psychiatric treatment per calendar year, paid for this placement. The situation reached crisis proportions because the Taylors' 1989 coverage was to expire on February 24, 1989 and no appropriate educational placement had been agreed upon.
 
 PROCEEDINGS BELOW
 
 24
 On January 20, 1989, the Taylors filed a complaint in district court asserting that the various state defendants responsible for providing Todd with public education and with mental health services, had violated Todd's right to a free appropriate public education. The Taylors sought preliminary and permanent injunctive relief, which would place Todd at San Marcos at no cost to them. After an evidentiary hearing, the district court granted plaintiffs' motion for a preliminary injunction on February 23, 1989, the day before the Taylors' insurance coverage ran out. Expressly finding that plaintiffs would probably succeed when the case proceeded to a final determination on the merits, and that they were likely to suffer irreparable harm if no residential placement was immediately identified, the court ordered that Todd be placed at San Marcos Treatment Center within 24 hours, and that the School District execute a contract with San Marcos and effect payment for the placement within 30 days.
 
 
 25
 The district court clearly viewed the situation as an emergency and expressly ordered Todd's placement in a facility outside California on an interim basis "until a final determination on the merits of this case can be made." The court stressed the absence in the record before it as of that date of any appropriate alternative to placement in San Marcos.
 
 
 26
 The district court also made it clear that its order assigning defendant Garden Grove School District primary liability for the costs of the placement at San Marcos was merely an interim measure pending final adjudication. The court concluded that the School District "will not necessarily be ultimately liable for the costs of Todd Taylor's placement from the date of the court's order until final determination." The court stated that before a final order would be entered, the court would try to have before it a breakdown of costs from San Marcos so that the costs could be apportioned among the other defendants, which included public agencies who would be responsible for Todd if he had no other means of support. We understand the court's order to mean that the School District will not ultimately be responsible for costs which the court determines are properly classified as exempted medical expenses.[4]
 
 
 27
 Our review of a ruling on a motion for a preliminary injunction is very limited, and district courts enjoy considerable discretion in determining whether an injunction should issue and in formulating its terms. Oakland Tribune, Inc. v. Chronicle Pub. Co., 762 F.2d 1374, 1376 (9th Cir.1985); Apple Computer, Inc. v. Formula International, Inc., 725 F.2d 521, 523 (9th Cir.1984). As we have often repeated, a party seeking a preliminary injunction "must show either (1) a likelihood of success on the merits and the possibility of irreparable injury or (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor." Apple Computer, 725 F.2d at 523; see also Oakland Tribune, 762 F.2d at 1376. "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." Oakland Tribune, 762 F.2d at 1376. They are not separate tests but rather "the outer reaches 'of a single continuum.' " Los Angeles Memorial Coliseum, 634 F.2d at 1201 (quoting Benda v. Grand Lodge of International Association of Machinists, etc., 584 F.2d 308, 315 (9th Cir.1978) (citations omitted)).
 
 
 28
 The district court's decision in this case shows that the court found that the balance of hardships tipped strongly in favor of the Taylors. The district court also concluded that plaintiffs would probably succeed in establishing San Marcos as the appropriate placement for Todd when the case came to a final determination.
 
 THE CONTENTIONS IN THIS APPEAL
 
 29
 The School District contends that the district court erred in entering the preliminary injunction because the plaintiffs had no likelihood of success on the merits. The School District maintains that it will succeed on the merits because the district court, in issuing the preliminary injunction, erred as a matter of law in holding that the EHA authorizes placement of a handicapped student in institutions like San Marcos. The School District characterizes San Marcos as a "psychiatric hospital," providing excludable medical services for which the School District is not financially responsible under section 1401(a)(17) of the EHA.
 
 
 30
 The district court, however, rejected the School District's characterization of San Marcos as a "hospital," finding it instead to be a boarding school facility with the capability of providing medical services as found by the hearing officer to be necessary for Todd. The district court also rejected alternative placements which had been suggested by the defendants, including Camarillo State Mental Hospital and the Transitional Living Center ("TLC"), largely in part because those facilities were not schools and provided no program of regularized education.
 
 
 31
 The record supports the district court. San Marcos operates a full-time school in which virtually all of its residents are enrolled. It is a state accredited educational institution. We and other courts have found a state's characterization of an institution an important factor in determining whether an institution is an educational facility. See, e.g., Clovis, 903 F.2d at 6 and 645-46 n. 4; Doe v. Anrig, 651 F.Supp. at 430; Darlene L. v. Illinois State Board of Education, 568 F.Supp. 1340, 1345-46 (N.D.Ill.1983). The court in Doe v. Anrig, for example, found a school district not financially liable for room and board expenses of a handicapped child at a psychiatric hospital, because the institution lacked state approval as an educational facility. 651 F.Supp. at 430; see also Clovis, 903 F.2d at 646 (school district not required to pay for placement of a handicapped child at a psychiatric hospital where state regulation excluded psychiatric hospitals as placement options for handicapped pupils); Darlene L., 568 F.Supp. at 1345-46 (same). In Clovis we distinguished residential facilities, like the one at bar which provide training and education, from institutions like the hospital at issue in Clovis, which serve primarily as medical facilities and are not recognized by the state as educational placements. 903 F.2d at 646, n. 4. At least four current residents at San Marcos have been placed there to receive a free appropriate public education under the EHA. These factors support the district court's finding, at least for purposes of a preliminary injunction, that San Marcos is an educational institution.
 
 
 32
 The situation in this case is thus different from that presented in Clovis where we recently held that a school district did not bear financial responsibility for a seriously emotionally disturbed child's placement at a psychiatric hospital. 903 F.2d at 644. Unlike San Marcos, the facility at issue in Clovis did not operate a full-time school. Rather, the school district provided classroom instructors to meet the educational needs of children hospitalized there. 903 F.2d at 644-45. In Clovis, a medical team supervised by a licensed physician determined the handicapped child's treatment program. Id. at 645. Here, in contrast, an IEP designed by the school system determines Todd's program. Furthermore, the child in Clovis, unlike Todd Taylor, was hospitalized primarily for medical as opposed to educational reasons. Id. Unlike Todd, the Clovis child was not "medically stable." In fact she required hospitalization to treat an "acute" psychiatric crisis.
 
 
 33
 Decisions by other circuits which have considered the financial liability of school districts for placements in facilities like San Marcos further indicate that the Taylors, not the School District, are likely to succeed on the merits. The Sixth Circuit in Clevenger, 744 F.2d at 516-17, required the school district in that case to pay for the placement of a seriously emotionally disturbed youth at San Marcos, on the grounds that the school could meet the child's educational and related needs. In Breen, 853 F.2d at 857, the Eleventh Circuit required a school district to pay for a child's placement at The Ranch, which like San Marcos, is a Brown school. The court based its decision on the fact that the school had the facilities to provide the child with an integrated program of educational and other supporting services. The Breen court, like the district court here, expressly refused to place the child in a psychiatric hospital finding that such a placement was inappropriate under the EHA because the hospital lacked the facilities to provide the child with an appropriate education.
 
 
 34
 The School District argues that it need not pay for Todd's placement at San Marcos because it offered an alternative placement, the Transitional Living Center, which would meet Todd's needs. Yet the district court rejected this placement expressly on the grounds that the TLC was unable to meet Todd's educational needs. The situation here, therefore, is virtually identical to that in Breen.
 
 
 35
 Furthermore, the record in this case compellingly supports the district court's conclusion that Todd's placement at San Marcos was necessary to meet his educational as opposed to his medical needs. See Clovis, 903 F.2d at 642-43 (in deciding whether a given placement is covered by the EHA, courts consider whether the purpose of the placement was primarily for educational or primarily for medical reasons); Kruelle v. New Castle County School District, 642 F.2d 687, 693 (3d Cir.1981) (same); see, e.g., Corbett v. Regional Center for the East Bay, Inc., 676 F.Supp. 964, 968-69 (N.D.Cal.1988); McKenzie v. Jefferson, 566 F.Supp. 404, 409, 412 (D.D.C.1983). As the district court found, Todd is intellectually able to absorb academic education at least through the high school level. The placement was not ordered in response to any medical crisis; on the contrary, the IEP developed on May 9, 1988 stated that Todd was "medically stable" and that a state hospital was inappropriate for him. As the district court noted, Todd requires a highly structured environment in which academic skills are taught as well as where personal and social contacts are an ordinary and necessary element of the surroundings. Such an environment is characteristic of a school, not of a hospital.
 
 
 36
 We find that under these circumstances, plaintiffs did establish a likelihood of success on the merits. Moreover, the facts of this case indicate that the balance of harm tipped sharply in favor of the plaintiffs. The Taylors' insurance coverage was about to expire on the eve of the court's grant of the preliminary injunction. The district court was faced with an emergency situation where a readily available appropriate placement was necessary to provide Todd with his educational and related needs. The district court expressly mitigated the potential harm to the School District by leaving for ultimate resolution the apportionment of costs between the various public agency defendants as well as leaving open the possibility of relocating Todd to California if an appropriate in-state placement could be found. The preliminary injunction is AFFIRMED.
 
 
 
 *
 Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation
 
 
 [1]
 For a review of decisions by other courts on the issue of residential placement of severely handicapped children and a discussion of possible approaches to problems raised by such placements, see Heufner, "Special Education Residential Placements Under the Education for All Handicapped Children Act," 18 J.L. & Education 411 (1989)
 
 
 [2]
 "Brown Schools" refers to a number of facilities dually licensed as hospitals and residential treatment centers which are operated by Brown, Schools, Inc
 
 
 [3]
 The comments accompanying 34 C.F.R. Sec. 300.13 (1989) indicate that "[t]he list of related services is not exhaustive and may include other developmental, corrective, or supportive services (such as artistic and cultural programs, and art, music, and dance therapy), if they are required to assist a handicapped child to benefit from special education."
 
 
 [4]
 We did not address the subject of apportionment in Clovis because the parties did not raise the issue in that case. 903 F.2d at 422 n. 3