921 F.2d 950
 Nui Loa PRICE, Doctor, also known as Maui Loa, individually
and in his capacity as chief of the Hou Hawaiians; the Hou
Hawaiians, a native Hawaiian Ohana; and Kamuela Price,
individually, and in his capacity as member of the elder
council of the Hou Hawaiians, Plaintiffs-Appellants,
v.
STATE OF HAWAII; William W. Paty, individually and as
Chairman of the Board of Land and Natural Resources of the
State of Hawaii; Leonard H. Zalopany, Moses W. Kealoha, J.
Douglas Ing, John Arisumi, Herbert Arata, individually and
as members of the Board of Land and Natural Resources of the
State of Hawaii; Richard L. Summers, William K.H. Mau, G.
Alan Freeland, Robert M. Fujimoto, Jim P. Perry, Hiroshi
Tanaka, George S. Yamaki, Newton Miyagi, Norman Koshiyama,
Hisao Munechika, Shinichi Nakagawa, et al., Defendants-Appellees,
and
Office of Hawaiian Affairs, Intervenor-Appellee.
 No. 88-15528.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 6, 1990.
Decided Dec. 26, 1990.
 
 Walter Schoettle, Honolulu, Hawaii, for plaintiffs-appellants, Doctor Nui Loa Price and the Hou Hawaiians.
 Kamuela Price, Honolulu, Hawaii, pro se.
 Charlotte Libman and Edwin Watson, Deputy Attys. Gen., Honolulu, Hawaii, for defendants-appellees.
 Cynthia Thielen and Boyce Brown, Jr., Honolulu, Hawaii, for the intervenor-appellee.
 Appeal from the United States District Court for the District of Hawaii.
 Before SKOPIL, BEEZER and FERNANDEZ, Circuit Judges.
 FERNANDEZ, Circuit Judge:
 
 
 1
 This case is still another sortie by Dr. Nui Loa Price, Kamuela Price, and the Hou Hawaiians (appellants) in their ongoing battle with the State of Hawaii (the State) and its officials over the use and disposition of lands granted by the United States to the State at the time it was admitted to the Union. As such, while it traverses some old ground (for example, the State's amenability to suit), it also opens a somewhat new front. Appellants claim that the State and its officials are, as a matter of federal law, subject to the strictures imposed upon private trustees and that they must manage the granted lands in accordance with private trust principles. We disagree and we affirm the decision of the district court.
 
 PROCEDURAL POSTURE AND BACKGROUND FACTS
 
 2
 Appellants, and others who have come before us in the recent past, are concerned that the State and its former and present officials are systematically misusing property which was ceded to the State upon a solemn trust. As a result, in the last few years we have had occasion to consider whether any cause of action exists and whether we even have jurisdiction to consider the claims of wrongdoing. See Price v. Akaka, 915 F.2d 469 (9th Cir.1990); Ulaleo v. Paty, 902 F.2d 1395 (9th Cir.1990); Price v. State of Hawaii, 764 F.2d 623 (9th Cir.1985), cert. denied, 474 U.S. 1055, 106 S.Ct. 793, 88 L.Ed.2d 771 (1986); Keaukaha-Panaewa Community Ass'n v. Hawaiian Homes Comm'n, 739 F.2d 1467 (9th Cir.1984) (Keaukaha II ); and Keaukaha-Panaewa Community Ass'n v. Hawaiian Homes Comm'n, 588 F.2d 1216 (9th Cir.1978), cert. denied, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979) (Keaukaha I ). We have already unraveled a number of the riddles and we are now asked to unravel another.
 
 
 3
 We start, as we have before, with section 5(f) of the Hawaii Admission Act. Pub.L. 86-3, Sec. 5(f), 73 Stat. 4 (1959) (the Act). We do so because that is the source of the rights asserted by appellants. As pertinent here, section 5(f) reads as follows, and we have emphasized the part most pertinent to our discussion:
 
 
 4
 The lands ... together with the proceeds from the sale or other disposition of any such lands and the income therefrom, shall be held by said State as a public trust for the support of the public schools and other public educational institutions, for the betterment of the conditions of native Hawaiians ..., for the development of farm and home ownership on as widespread a basis as possible for the making of public improvements, and for the provision of lands for public use. Such lands, proceeds, and income shall be managed and disposed of for one or more of the foregoing purposes in such manner as the constitution and laws of said State may provide, and their use for any other object shall constitute a breach of trust for which suit may be brought by the United States.
 
 
 5
 Appellants brought this action claiming that the State and its officials are in violation of the Act because they have failed to keep the ceded lands, and the income from those lands, segregated from other state assets and income, because they have, in effect, scattered those lands among various departments and agencies of the State, and because they have failed to invest prudently. To a large extent those actions by state officials have been authorized, or at least permitted, by the State's constitution and statutes, so appellants have also attacked those enactments as unconstitutional on their face. The district court dismissed the action against the State on grounds of eleventh amendment immunity, and went on to hold that the former state officials enjoyed qualified immunity for their acts. Finally, as to the defendants who were left in the action, the court found that the appellants' action had no merit. The court also denied a motion to reconsider its ruling regarding the immunity of the State and imposed sanctions upon appellants' counsel for troubling the State with that motion, which the court deemed frivolous.
 
 
 6
 Appellants took this appeal, but their counsel did not appeal the sanction order, a fact which has not dissuaded appellants from undertaking to argue the propriety of that order before us.
 
 JURISDICTION AND STANDARD OF REVIEW
 
 7
 The district court had jurisdiction pursuant to 28 U.S.C. Sec. 1343 and 42 U.S.C. Sec. 1983. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291.
 
 
 8
 We review the grant of summary judgment and the grant of a motion to dismiss de novo. Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). We also review issues of the eleventh amendment and qualified immunity de novo. Di Martini v. Ferrin, 889 F.2d 922, 925-26 (1989) (qualified immunity), amended, 906 F.2d 465 (9th Cir.1990). Questions of immunity which arise from facts not in dispute also present issues of law which we review de novo. See Babcock v. Tyler, 884 F.2d 497, 501 (9th Cir.1989) (absolute immunity issue is one of law), cert. denied, --- U.S. ----, 110 S.Ct. 1118, 107 L.Ed.2d 1025 (1990). In addition, questions regarding the construction of statutes, including the Act, are issues of law and are reviewed de novo. Price v. Akaka, 915 F.2d at 471.
 
 
 9
 The denial of a motion for reconsideration is reviewed for abuse of discretion. Courtney v. Canyon Television & Appliance Rental, Inc., 899 F.2d 845, 848-49 (9th Cir.1990); Thompson v. Housing Auth., 782 F.2d 829, 832 (9th Cir.), cert. denied, 479 U.S. 829, 107 S.Ct. 112, 93 L.Ed.2d 60 (1986). The denial of a request for leave to amend is also reviewed for abuse of discretion. Thomas-Lazear v. FBI, 851 F.2d 1202, 1206 (9th Cir.1988).
 
 DISCUSSION
 
 10
 A. The Allocation of Power Over Trust Land; The Proper Scope of the Action Under 42 U.S.C. Sec. 1983.
 
 
 11
 The centerpiece of appellants' case is their claim that we must, in effect, treat the State as a private trustee would be treated. That claim has lurked in the background of other cases which have come before us, but it has not previously been presented as starkly as it is here. It presents a most serious issue of federal-state relationships and we have dealt very carefully with its emanations in our previous decisions. In Ulaleo, for example, there was an attempt to assert that the handling of the ceded lands was a violation of state law and of the state constitution. 902 F.2d at 1400. We refused to consider those claims and referred the parties to the state courts. Id. On the other hand, in Price v. Akaka, we were faced with a claim that section 5(f) income had been expended for improper purposes, and we recognized that the claim involved more than state law. Instead, it reached the federal law contours because that kind of action would directly violate the Act itself. 915 F.2d at 472; see also Keaukaha II, 739 F.2d at 1472. Those cases began to adumbrate the path which we must take if we are to bring the issues into proper focus.
 
 
 12
 Under the Act, the ceded lands are to be held upon a public trust, and under section 5(f) the United States can bring an action if that trust is violated. However, nothing in that statement indicates that the parties to the compact agreed that all provisions of the common law of trusts would manacle the State as it attempted to deal with the vast quantity of land conveyed to it for the rather broad, although not all-encompassing, list of public purposes set forth in section 5(f).
 
 
 13
 There is no free floating federal common law of trusts, but we have no doubt that we would have the power to formulate a body of law for the purpose of enforcing the Act if that were appropriate under the circumstances. See, e.g., United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); and United States v. Mitchell, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). No doubt that would not present insuperable difficulties, since the common law of trusts is well developed in this country and speaks with a good deal of uniformity across the length and breadth of the land. Cf. Ahuna v. Department of Hawaiian Home Lands, 64 Haw. 327, 335-40, 640 P.2d 1161, 1167-69 (1982), where the court had little difficulty in applying fiduciary principles. Indeed, our decisions in Price v. Akaka, 915 F.2d at 471-72, and Keaukaha II, 739 F.2d at 1471-72, drew upon trust law. No doubt there will come a time when we are required to consider that law further, for at least at the outer limits federal law must act as a barrier beyond which the State cannot go in its administration of the ceded lands pursuant to section 5(f).
 
 
 14
 It is doubtful that appellants have presented questions that require a deep analysis of the federal barrier in this case, and to the extent they do we must return to the terms of the Act itself. There can be no doubt that the provisions of the Act must be looked to when we consider the nature and extent of the State's duties and powers. That is a simple and universal trust principle. See Robinson v. United States, 632 F.2d 822, 826 (9th Cir.1980); Restatement (Second) of Trusts Sec. 164(a) (1959); 2A A. Scott & W. Fratcher, The Law of Trusts, Sec. 164 (4th ed. 1987); see also United Mine Workers v. Robinson, 455 U.S. 562, 573-74, 102 S.Ct. 1226, 1232-33, 71 L.Ed.2d 419 (1982); Lassen v. Arizona ex rel. Arizona Highway Dep't, 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967). It is also a principle of statutory construction. Dole v. United Steelworkers of America, --- U.S. ----, ----, 110 S.Ct. 929, 934, 108 L.Ed.2d 23 (1990).
 
 
 15
 Here the language of section 5(f) declares that the State is to have the power to manage the property and its income in a manner that the constitution and laws of the State provide. That confers a broad authority upon the State. It is, for example, considerably broader than the language which the Court analyzed in Lassen. There the method to be used in handling the lands granted to the State of Arizona was set forth in exquisite detail. 385 U.S. at 470-74, 87 S.Ct. at 590-92. The State of Arizona had to follow those detailed provisions, at least for the most part. 385 U.S. at 465-70, 87 S.Ct. at 588-90. Nor can it be said that section 5(f) generally creates a trust which demands the exacting standards of administration that the United States has often imposed upon itself when it is dealing with Native Americans. See, e.g., Seminole Nation v. United States, 316 U.S. 286, 296-97, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942). With the exception of the Hawaiian home lands, for which special provisions are made in section 4 of the Act, no such extraordinary concerns appear to inform section 5(f).[1]
 
 
 16
 Given that, it would be error to read the words "public trust" to require that the State adopt any particular method and form of management for the ceded lands. All property held by a state is held upon a "public trust." Those words alone do not demand that a state deal with its property in any particular manner even if, as a matter of prudence, the people usually require a close accounting by their officials. Those words betoken the State's duty to avoid deviating from section 5(f)'s purpose. They betoken nothing more.
 
 
 17
 Therefore, it is not for us to declare that certain methods of holding, managing, and accounting for the ceded lands and income must be followed by the State and its officials. Whether the trust administration paradigm or some other paradigm informs the management method selected is a matter for the State's determination. It follows that the appellants cannot succeed on their claims that section 5(f) has been violated simply because the State has commingled the ceded lands and their income with other lands and income, or because it has not invested in what appellants deem to be a prudent manner, or because the lands are in the hands of various departments and agencies of the State. As we noted in Price v. Akaka, as long as the lands or income remain in the hands of the State they remain impressed with the public trust created by the Act. 915 F.2d at 472. It is true that we would lift our eyebrows were a private trustee to commingle trust funds committed to its administration, but that does not suggest that we should find that the State and its officials have violated section 5(f) when they do so.
 
 
 18
 That does not mean that the State can do what it likes with the property and the income. Rather, the federal courts must ultimately determine whether the property has been diverted from section 5(f) purposes. That would, however, have to be in the context of litigation brought by the United States under section 5(f) or in the context of private litigation under Section 42 U.S.C. Sec. 1983 which focused on some particular diversion. The action by these very appellants in Price v. Akaka is precisely that kind of litigation.
 
 
 19
 We recognize that this view of the allocation of power between the State and the federal government in section 5(f) could make it more difficult for parties who are attempting to assure that the State does adhere to its responsibilities. That is so because the various rules which apply to private trustees are admirably well designed to prevent and allow early detection of diversions of trust funds. On the other hand, our reading of section 5(f) rests on the apparent decision by the parties involved in the Act that the State and its officials would proceed with a certain degree of good faith and need not be held to strict trust administration standards. Our reading also helps assure that the federal courts will not become involved in the micro management of the government of the State. While we must stand ready to correct diversions of funds from the listed purposes, we need not and should not immerse ourselves in the day-to-day activities of state officials as they struggle with the immense task of managing the resources of the State for public purposes.
 
 
 20
 B. Facial Validity of the State Constitution and Statutes.
 
 
 21
 Appellants attack certain provisions of the constitution and statutes of the State in apparent support of their claims that the state and its past and present officials have violated, are violating, and will violate section 5(f) by following the provisions of those enactments. These claims appear to be based upon appellants' assumptions about the management of the ceded lands which we have already disposed of. Nevertheless, we will address each of the contentions in turn.
 
 
 22
 Before doing so, we should point out that it is not our function to attempt to seek out conflicts between the enactments of the State and section 5(f) of the Act. Thus, even if an enactment could conceivably be read broadly enough to permit a violation, we will not assume that the violation has taken place or that it will. See Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 45-46, 86 S.Ct. 1254, 1261-62, 16 L.Ed.2d 336 (1966), overruled on other grounds, Healy v. Beer Inst., Inc., 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); Stein Distrib. Co., Inc. v. Department of Treasury Bureau of Alcohol, Tobacco & Firearms, 779 F.2d 1407, 1411 (9th Cir.), cert. denied, 476 U.S. 1111, 106 S.Ct. 1963, 90 L.Ed.2d 649 (1986). On the contrary, we must be careful to limit ourselves to the specific problem which is actually subtended by the case under consideration. See New York v. Ferber, 458 U.S. 747, 767-770, 102 S.Ct. 3348, 3360-61, 73 L.Ed.2d 1113 (1982).
 
 
 23
 We turn, then, to the provisions under attack.
 
 
 24
 Appellants assert that Article XII, Section 4, of the State Constitution is in violation of section 5(f) of the Act, because the constitutional provision declares that the ceded lands are to be held as a public trust for native Hawaiians and the general public. Appellants seem to believe that the language is broad enough to permit an improper diversion of funds. However, on its face the language is quite consonant with section 5(f). It takes no expansive reading of that section to see that it does, indeed, provide for the welfare of the general public as well as native Hawaiians and does so in a myriad of ways.
 
 
 25
 Appellants go on to claim that Article XII, Sections 5 and 6 of the State's constitution are similarly invalid in that they create the Office of Hawaiian Affairs (OHA), and do not expressly preclude that office from diverting trust funds. This claim, too, is meritless. There is nothing improper about creating a state agency, even if that agency is to receive and manage ceded land or its income.
 
 
 26
 Appellants then attack the statutory provisions under which the OHA operates. Haw.Rev.Stat. Secs. 10-1 through 10-16 (1985). Those provisions require that a portion of the funds from the ceded lands will be directed to OHA. It permits expenditures for native Hawaiians and for Hawaiians. While there may properly be questions regarding whether particular expenditures for Hawaiians would be within the section 5(f) purposes, there is nothing on the face of the statute which puts it in violation of that section. It is true that the State Attorney General once opined that the section 5(f) funds received by the OHA could only be used for native Hawaiians, but that does not affect our analysis. See Op. Att'y Gen. 83-2 (Apr. 15, 1983). The propriety of specific expenditures by OHA will be tested in the crucible of the Price v. Akaka litigation. See 915 F.2d at 470-74.
 
 
 27
 Appellants next attack the provisions of state law which allow the governor, with Board of Land and Natural Resources (BLNR) approval, to set aside public lands to state departments, agencies, and other political subdivisions for public uses and purposes. Haw.Rev.Stat. Sec. 171-11 (1985). Here, again, appellants seem to be of the opinion that any such transfer of ceded lands would violate the section 5(f) trust. However, since the lands would undoubtedly remain impressed with the trust,[2] the mere transfer, if it takes place, is not a violation of section 5(f). See Price v. Akaka, 915 F.2d at 472. Cf. Mobile Transp. Co. v. City of Mobile, 187 U.S. 479, 23 S.Ct. 170, 47 L.Ed. 266 (1903). This is driven home by the requirement that the land must be returned to BLNR if it ceases to be used for the purpose for which it was transferred. Haw.Rev.Stat. Sec. 171-11 (1985). If there is some violation in the purposes for which the land is transferred, or in the use to which it and its income are ultimately put, that is another matter entirely. It is not now before us.
 
 
 28
 Finally, appellants attack the provisions of the State's statutes which provide for the Aloha Tower Development Corporation. Haw.Rev.Stat. Secs. 206J-1 through 206J-21 (1985). That entity is an instrumentality of the State. Haw.Rev.Stat. Sec. 206J-4. To the extent that section 5(f) lands are a part of that entity, there is no reason to believe that they are not still impressed with the trust restrictions. Moreover, there can be little doubt that the land was destined for use in "the making of public improvements," a section 5(f) use. Haw.Rev.Stat. Sec. 206J-1. If, perforce, some diversion of it or of its proceeds does take place, that is for another day. It does not demonstrate the invalidity of the statute itself.
 
 
 29
 We, therefore, end this section where we began it. We observe that appellants' complaints are based on their notions of how the ceded lands must be managed. Those notions are in error, and we will not step in until section 5(f)'s purposes are actually endangered.
 
 
 30
 C. Eleventh Amendment Immunity.
 
 
 31
 Appellants have attempted to sue the State, as they have done before. See Price v. State of Hawaii, 764 F.2d at 629. It is pellucid that they cannot, for the eleventh amendment prohibits it. We have told them that before. Id. We have told others the same thing. See Ulaleo, 902 F.2d at 1398. Nothing has changed.
 
 
 32
 Appellants' assertion that the State has consented to being sued in its own courts does not help their position. See Haw.Rev.Stat. Sec. 661-1 (1985). That does not waive its eleventh amendment immunity. See Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 99 n. 9, 104 S.Ct. 900, 907 n. 9, 79 L.Ed.2d 67 (1984).
 
 
 33
 Thus, the district court did not err when it dismissed the action against the State.
 
 
 34
 By the same token, the court did not err when it refused to allow an amendment which was promised to, futilely, spell out still further claims against the State. See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); Reddy v. Litton Indus., Inc., 912 F.2d 291, 296-97 (9th Cir.1990). Nor did it commit error when it turned aside appellants' otiose motion for reconsideration.[3]
 
 
 35
 This determination offers no succor to the state officials. The suit against present officials seeks prospective relief, which is proper.[4] See Keaukaha II, 739 F.2d at 1472. To the extent that damages are sought against former officials, the State is not implicated. See Price v. Akaka, 915 F.2d at 473.
 
 
 36
 D. Qualified Immunity.
 
 
 37
 Appellants sought damages from the former governor of the State and from former members of the BLNR, all arising out of appellants' claims regarding violations of section 5(f) which we have already disposed of. That is, their claims against these officials turn on their contentions that the officials violated section 5(f) when they allocated lands or funds to various state entities, failed to segregate assets, and were not prudent enough investors. As we have already shown, appellants' theories of liability would not bear fruit in any event. Still, we will consider the claim that these officials escaped from the action too early.
 
 
 38
 The activities engaged in by the former officials were undoubtedly authorized by state law. While blindly following state law should not free an official from liability, there is little reason to find exposure to liability if the official proceeded in reasonable reliance upon the validity of a statute, and the constitutional error was that of the people or of the legislature. Cf. Illinois v. Krull, 480 U.S. 340, 350, 107 S.Ct. 1160, 1167, 94 L.Ed.2d 364 (1987) (suppression denied when officer reasonably relied upon a state statute).
 
 
 39
 More pertinently, perhaps, officials performing discretionary functions, as were these officials, are entitled to qualified immunity if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Appellants acknowledge this principle, but they claim that since the ceded lands were in a public trust the officials should have known that a failure to follow common law trust principles would violate section 5(f) of the Act. We disagree. Even assuming that incantation of the word "trust" is enough to tell people that they must act in the best interests of others, that knowledge exists at too high a level of generality. The violated duties must be described "in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); see also Los Angeles Police Protective League v. Gates, 907 F.2d 879, 887 (9th Cir.1990); Ortiz v. Van Auken, 887 F.2d 1366, 1368 (9th Cir.1989). That does not describe the case before us.
 
 
 40
 In this case, the appellants assert rights that did not exist as a matter of federal law. Even were we to discover at some later time that some variant of those rights must be adopted into the law surrounding section 5(f) of the Act, that would not deprive these former officials of qualified immunity. At the time they acted, the contours of federal law had not been established. In other words, this case is not at all like Ostlund v. Bobb, 825 F.2d 1371 (9th Cir.1987), cert. denied, 486 U.S. 1033, 108 S.Ct. 2016, 100 L.Ed.2d 603 (1988), upon which appellants put great reliance. This was not a situation where there was a mere absence of a specific binding precedent; it was a situation where officials would have been forced to predict the future course of section 5(f) jurisprudence. That they were not required to do. Id. at 1374.
 
 
 41
 Appellants, therefore, are not asserting clearly established rights in this case; they are only asking that we now clarify the reach of federal law for the State and its officials. This is exactly the kind of case in which qualified immunity was designed to operate.
 
 CONCLUSION
 
 42
 Appellants have long and vigorously sought to assure that the State and its officials make proper use of the section 5(f) lands. They have been effective gladiators, and we do not by this decision convert them into andabatae. They may still turn their limpid and searching gaze upon the activities of state officials. They may still call officials to account when funds are actually diverted from section 5(f) purposes in violation of the Act. Perhaps they can also seek remedies under state law.
 
 
 43
 What they cannot do is insist that the State adopt a particular approach to management and holding of the ceded lands or of the income from those lands. What they cannot do is require the segregation of lands, their proceeds, and their income.
 
 
 44
 Needless to say, state officials do run a substantial risk if they so commingle assets that they cannot defend claims that improper expenditures have been made. That is particularly true when, as we have now twice held,[5] those lands and their income remain subject to the trust while they are in the hands of the state governmental entities. However, that presents no triable issue in this case.
 
 
 45
 AFFIRMED.
 
 
 
 [1]
 This case does not involve the administration of the Hawaiian home lands
 
 
 [2]
 At oral argument the State conceded that this is so
 
 
 [3]
 It was this motion that inspired the district court to award sanctions against counsel. While appellants have presented argument about the propriety of the sanctions, they were not imposed upon appellants, and the sanction order was not appealed by counsel. We cannot decide this issue. See Estate of Bishop v. Bechtel Power Corp., 905 F.2d 1272, 1275-76 (9th Cir.1990)
 
 
 [4]
 We assume that appellants do not seek retrospective relief against these officials. To the extent retrospective relief may have been sought, it is not available. Ulaleo, 902 F.2d at 1398-1400
 
 
 [5]
 Of course, we so held in Price v. Akaka and we independently so hold today