977 F.2d 591
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Todd TAYLOR, et al., Plaintiff-Appellee,
v.
Bill HONIG, Superintendent of Education, Defendant,
and
Thomas Uram; Bernard Rappaport; Gary Ruelas; William G.
Loomis, et al., Defendants-Appellants.
 No. 91-55065.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Sept. 9, 1992.
Decided Oct. 22, 1992.
 
 Before BEEZER, CYNTHIA HOLCOMB HALL and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 BACKGROUND
 
 2
 At the time this action arose, Todd Taylor was a seventeen year old seriously emotionally disturbed child entitled to special education and related services under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.S. §§ 1400-1485 (1989 & Supp.1991). See 20 U.S.C.S. § 1401(a)(1); 34 C.F.R. § 300.5(b)(8) (1991). In September 1986, Garden Grove Unified School District referred Todd to the Orange County Department of Mental Health for psychiatric and psychological services, defined as "related services" under the IDEA. § 1401(a)(17). Later, in December 1986, an Individualized Education Plan (IEP) was developed for Todd in conjunction with a representative from Mental Health. In accordance with this IEP, Todd was placed in a nonresidential special education school, at public expense, with psychiatric and psychological services provided by Mental Health as an adjunct.
 
 
 3
 This arrangement proved unsatisfactory because Todd's severe emotional problems resulted in violent attacks against his family. In March, June, and September 1987, Todd was arrested for violence against his family and placed in Orange County Juvenile Hall. After his September 1987 arrest and incarceration, Todd became a ward of the Orange County Juvenile Court because his parents, Byron and Andrea Taylor, were unwilling to accept Todd back into their home. The Juvenile Court entered an order taking physical and legal custody of Todd from the Taylors and placing such custody with a Juvenile Probation Officer. The Juvenile Court also detained Todd at Juvenile Hall pending an appropriate placement. Andrea Taylor participated in these Juvenile Court proceedings.
 
 
 4
 In October 1987, the Taylors convened an IEP team meeting with a representative from Mental Health as part of the team. The IEP team agreed that Juvenile Hall was not meeting Todd's needs and that Todd should be placed in a therapeutic setting as soon as possible. The school district, Mental Health, and Todd's probation officer were to work together to find an appropriate placement for Todd. However, they were unable to find an appropriate placement for Todd, and Todd spent six months in Juvenile Hall.
 
 
 5
 During Todd's stay at Juvenile Hall his psychological and emotional problems worsened, and his mental condition began to affect his physical health. Todd became severely withdrawn and lost weight. Thus, Mental Health arranged for Todd to be transferred from Juvenile Hall to the University of California Irvine Medical Center on March 14, 1988, to receive a comprehensive medical and psychiatric evaluation and treatments, such as electro-convulsive shock therapy, that were unavailable at Juvenile Hall.
 
 
 6
 In May 1988, an IEP meeting was held to find a residential placement for Todd because he was going to be released from the Irvine Medical Center and sent back to Juvenile Hall. At that time, the school district, Mental Health, and Todd's probation officer still had been unable to find a residential placement that was willing to accept Todd and that was acceptable to the Taylors. Thus, Todd was going to be transferred back to Juvenile Hall. Because Mental Health believed that Todd was not mentally and physically well enough to adjust to another placement at Juvenile Hall, Mental Health arranged for Todd's temporary placement to be changed from Juvenile Hall to Camarillo State Hospital (CSH). Due to this change, Todd was released from Irvine Medical Center to CSH instead of to Juvenile Hall. On June 28, 1988, the Taylors were appointed Todd's coconservators in a hearing before the Superior Court, and Todd remained at CSH pending placement at an appropriate residential facility.
 
 
 7
 Frustrated at the inability of the IEP team to find a placement for Todd, the Taylors convened an administrative due process hearing in August 1988. The hearing officer issued a final decision ordering the school district and Mental Health to provide Todd with an appropriate residential placement. More IEP meetings were scheduled, and Mental Health proposed five different placements for Todd. However, these recommended placements turned out either to be unavailable or unacceptable to the Taylors.
 
 
 8
 In the meantime, the Taylors removed Todd from CSH in September 1988 and put him in the Irvine Medical Center again. Todd was released from Irvine Medical Center in November, and the Taylors took Todd back into their home. However, after Todd again attacked his family, the Taylors sent Todd back to the Irvine Medical Center in January 1989. The Taylors' insurance would allow them to keep Todd at Irvine Medical Center only until February 24, 1989. Thus, the Taylors brought an action under the IDEA to force the school district and Mental Health to place Todd at San Marcos, a residential facility that the Taylors had been advocating in the IEP meetings. The United States District Court for the Central District of California issued a preliminary injunction placing Todd at San Marcos and ordering the school district to pay for the placement. On appeal, this court affirmed the district court's decision. Taylor v. Honig, 910 F.2d 627 (9th Cir.1990).
 
 
 9
 The Taylors complaint also sought damages under 42 U.S.C. § 1983 from Bill Honig, the California Department of Education, the school district, the Board of Education of Garden Grove Unified School District, the Orange County Department of Education, Cliff Allenby, the California Health and Welfare Agency, the California Department of Mental Health, Michael O'Connor, the County of Orange, the Board of Supervisors of Orange County, and four employees of Mental Health. This appeal involves the four employees of Mental Health: Thomas Uram, Director of the Orange County Department of Mental Health; Bernard Rappaport, M.D., Deputy Director of Children and Youth Services; Gary Ruelas, former Service Chief of Children and Youth Services, Western Region; and William G. Loomis, M.D., one of the doctors who works with patients at Juvenile Hall.
 
 
 10
 These four Mental Health defendants claimed qualified immunity from suit and moved for summary judgment on that basis. The district court denied the motion. Although the district court found that the case against the individual defendants was "thin," it determined that the plaintiff's case was sufficient to withstand summary judgment. The four individual Mental Health defendants appeal this decision.
 
 DISCUSSION
 
 11
 The Mental Health defendants claim qualified immunity pursuant to the rule set forth in Harlow v. Fitzgerald, 457 U.S. 800 (1982). Under Harlow, the Mental Health defendants are entitled to immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818; see also Estate of Conners v. O'Connor, 846 F.2d 1205 (9th Cir.1988), cert. denied, 489 U.S. 1065 (1989). "All [we] need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or ... whether the law clearly proscribed the actions the defendant claims he took." Mitchell v. Forsyth, 472 U.S. 511, 528 (1985); Manhattan Beach Police Officers Ass'n v. City of Manhattan Beach, 881 F.2d 816, 818 (9th Cir.1989). The denial of a motion for summary judgment based on a claim of qualified immunity is reviewed de novo. Price v. State of Hawaii, 921 F.2d 950, 954 (9th Cir.1990); Baker v. Racansky, 887 F.2d 183, 185 (9th Cir.1989).
 
 I. The IDEA Claims
 
 12
 The Taylors' primary argument is that the defendants denied Todd's rights to a residential placement under the IDEA. The dispute arose because the Taylors and the defendants could not agree on Todd's residential placement. The Taylors eventually prevailed in forcing the school district and the Department of Mental Health to place Todd in the residential placement of the Taylors' choice, and they now argue that the defendants should be liable for damages for not making the placement sooner.
 
 
 13
 At the time this action arose, it was clear that Todd had a right to an appropriate education at public expense. See, e.g., Smith v. Robinson, 468 U.S. 992, 1010 (1984) ("[T]he Act establishes an enforceable substantive right to a free appropriate public education."). It also was clear that Todd had a right to a residential placement under the IDEA if such a placement was necessary under his IEP. See 20 U.S.C. §§ 1401(a)(9)-(10), (16)-(17), 1413(a)(4)(B); Clevenger v. Oak Ridge School Bd., 744 F.2d 514, 515 (6th Cir.1984); Kruelle v. New Castle School Dist., 642 F.2d 687, 692 (3d Cir.1981); Christopher T. v. San Francisco Unified School Dist., 553 F.Supp. 1107, 1119 (N.D.Cal.1982); Gladys J. v. Pearland Independent School Dist., 520 F.Supp. 869, 875 (S.D.Tex.1981) (The "guarantee of a 'free and appropriate public education' requires state and local educational agencies to provide residential placement when necessary to the goals of an [IEP].").
 
 
 14
 The Taylors wanted Todd to be placed in an appropriate residential facility as soon as possible after Todd became a ward of the state. For this purpose, the Taylors convened IEP meetings, compelled an administrative due process hearing, and eventually obtained a preliminary injunction in the district court. In this process, the Taylors identified San Marcos as an appropriate residential facility for Todd.
 
 
 15
 The Mental Health defendants also recognized that a residential placement was necessary for Todd early in this process. However, the Mental Health defendants had difficulty finding a residential placement that would accept Todd and disagreed with other members of the IEP team concerning San Marcos.
 
 
 16
 The Taylors allege that the Mental Health defendants engaged in a scheme to avoid their obligations under the IDEA by manipulating the IEP meeting process to prevent the selection of a private (and expensive) residential facility and to warehouse Todd at Juvenile Hall and CSH. The Taylors also allege that the Mental Health defendants intentionally sabotaged Todd's IEP meetings by consistently failing to provide a representative with the authority to make residential placement decisions at the IEP meetings. If the Mental Health defendants intentionally sabotaged IEP meetings and "warehoused" Todd, Honig v. Doe, 484 U.S. 305, 309 (1988), they violated Todd's clearly established statutory right to a free appropriate public education of which a reasonable person would have known. Thus, the Taylors have alleged conduct that violated the clearly established right to a free public education,[1] and the Mental Health defendants are not entitled to qualified immunity under Harlow. The Taylors may pursue this IDEA claim.
 
 
 17
 The Taylors also allege that the transfer of Todd from Juvenile Hall to CSH was a change in placement that violated both the procedural requirements of § 1415(b) and the stay-put provision of § 1415(e)(3). Under § 1415(b)(1)(C), a state educational agency that receives assistance under the IDEA must give "written prior notice to the parents or guardian of the child whenever such agency ... proposes to initiate or change ... the ... educational placement of the child...." § 1415(e)(3) requires that "the child shall remain in the then current educational placement" during the pendency of any IDEA proceedings.
 
 
 18
 The Taylors argue that Todd's admission to CSH was a change in placement under the reasoning of Honig. Honig, however, does not govern this issue. In Honig, the Supreme Court found that removal from a school for more than ten days is a change in the "current educational placement" of a child. 484 U.S. at 323-29 (quoting 20 U.S.C. § 1415(e)(3)). Honig does not hold that a juvenile hall is a current educational placement for purposes of the IDEA. Moreover, the IEP team never recognized Juvenile Hall as an educational placement; Juvenile Hall was an interim arrangement until Todd could be placed in an appropriate residential facility. Finally, the court order specifically states that Todd was detained at Juvenile Hall pending "placement."[2]
 
 
 19
 Although the education Todd received while detained at Juvenile Hall was the only education available to him at the time, and thus in some sense was Todd's current educational placement, Juvenile Hall was never Todd's educational placement for IDEA purposes; it simply was a place for detainment pending an educational placement. Todd's IEP was never changed to include Juvenile Hall as an educational placement. Moreover, the "stay-put provision" of § 1415(e)(3) was enacted to keep disabled children in school. Honig, 484 U.S. at 324. It was not enacted to keep disabled children in a juvenile hall. Therefore, the transfer from Juvenile Hall was not a change in placement for purposes of subsections 1415(b)(1)(C) and (e)(3). Accordingly, the Taylors' complaint does not allege conduct that violated clearly established rights under subsections 1415(b)(1)(C) and (e)(3), and the Taylors may not pursue this claim.
 
 
 20
 Even had we concluded that the transfer from Juvenile Hall to CSH was a change in educational placement for the purposes of the notice requirements of § 1415(b)(1)(C) and the stay-put provision of § 1415(e)(3), the Taylors nevertheless had no rights under these provisions because Todd's probation officer was his legal guardian. Indeed, the Taylors admit that after Todd became a ward of the state "Todd's parents had no legal authority to pursue his rights under the IDEA."
 
 
 21
 In their citations to this court, the Taylors delete the term "guardian" from § 1415(b)(1)(C). However, the statute requires "written prior notice to the parents or guardian of the child...." § 1415(b)(1)(C) (emphasis added). Similarly, the stay-put provision requires the child to remain in an educational placement "unless the State or local agency and the parents or guardian otherwise agree...." § 1415(e)(3) (emphasis added).
 
 
 22
 The Juvenile Court order that detained Todd at Juvenile Hall found that the "welfare of the minor require[d] custody to be taken from [Todd's] parents." The Juvenile Court therefore vested custody in Todd's juvenile probation officer pending a suitable placement. Todd's probation officer, not the Taylors, was the proper person to receive notice for purposes of § 1415(b)(1)(C) and to make agreements pursuant to § 1415(e)(3).[3]
 
 
 23
 Section 1415(b)(1)(B) requires "procedures to protect the rights of the child whenever ... the child is a ward of the State, including the assignment of an individual (who shall not be an employee of the State educational agency, local educational agency, or intermediate educational unit involved in the education or care of the child) to act as a surrogate for the parents or guardian." The Taylors allege that the probation officer was not a "surrogate parent" as required by § 1415(b)(1)(B).
 
 
 24
 It is well settled that Todd's probation officer was his legal guardian while Todd was a ward of the state:
 
 
 25
 For all practical purposes, when a dependent child is ordered removed from parental custody under [California Welfare and Institutions Code] section 361, both legal and physical custody appear under section 361.2, subdivision (b) to be ordered to reside in the probation officer. This conclusion is supported by section 362, subdivision (a), which provides a broad grant of authority to the juvenile court to make any and all reasonable orders "for the care, supervision, custody, conduct, maintenance, and support of the minor," where the minor has been adjudged a dependent child of the court.
 
 
 26
 In re Robert A., 4 Cal.App. 4th 143, ---, 5 Cal.Rptr.2d 438, 444 (Ct.App.1992). This conclusion is well supported by California law. When a minor is a ward of the state, the minor's probation officer is deemed to be the minor's parent or guardian. See Cal.Welf. & Inst.Code § 202(a) (West 1984 & Supp.1992) ("When the minor is removed from his or her own family, it is the purpose of this chapter to secure for the minor custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents."); In re Michael C., 579 P.2d 7, 10 (Cal.1978) ("we recognize the role of the probation officer as a trusted guardian figure who exercises the authority of the state as parens patrie and whose duty it is to implement the protective and rehabilitative powers of the juvenile court"), rev'd on other grounds, Fare v. Michael C., 442 U.S. 707 (1979); In re Florance, 300 P.2d 825, 827 (Cal.1956) ("The state, represented by the juvenile court and the probation officer, stands in loco parentis to the minor."); In re Judson W, 185 Cal.App.3d 838, ---, 230 Cal.Rptr. 92, 92 (Ct.App.1986) (minor "removed from the custody of both parents ... and committed to care and custody of the probation officer").
 
 
 27
 It also appears that the appointment of guardians for wards of the state satisfies the "surrogate parent" requirement of § 1415(b)(1)(B). See Garrity v. Gallen, 522 F.Supp. 171, 226 (D.N.H.1981). To comply with this section, the guardian must not be an employee of the educational agency involved in the education or care of the child. The probation officer is an employee of the Orange County Probation Department. The Taylors allege that the Orange County Department of Education and the Orange County Department of Mental Health, and not the Probation Department, are responsible for the education and care of Todd. Moreover, it appears that Todd's probation officer did indeed assert Todd's rights and attempt to protect Todd's interests. Thus, Todd's juvenile probation officer appears to qualify as a surrogate parent under the IDEA. In any event, it was not clearly established that the appointment of a probation officer as Todd's legal guardian violates the requirements of § 1415(b)(1)(B).
 
 II. Eighth Amendment Claims
 
 28
 The Taylors correctly note that it was clearly established law that "deliberate indifference" to the medical and psychiatric needs of a child in Juvenile Hall is cruel and unusual punishment that violates the child's Eighth Amendment rights. Estelle v. Gamble, 429 U.S. 97, 104 (1976); Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir.1982). However, the Taylors have failed to allege any facts that show deliberate indifference to Todd's medical and psychiatric needs. As this court recently explained, "In determining deliberate indifference, we scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect." Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir.1990). Deliberate indifference requires a strong showing of intentional neglect; "mere malpractice, or even gross negligence, does not suffice." Id.
 
 
 29
 The Supreme Court recently followed this analysis. In Wilson v. Seiter, 111 S.Ct. 2321, 2323 (1991), the Court made it clear that the Eighth Amendment is not violated by inadvertent failure to provide adequate medical care or negligent diagnosis. The requisite culpable state of mind--deliberate indifference--is a high threshold to meet. The Eighth Amendment claimant must allege and show "unnecessary and wanton infliction of pain," id. (citations omitted), or that the medical official acted "maliciously and sadistically for the very purpose of causing harm." Id. at 2326 (citations omitted).
 
 
 30
 The Taylors allege that Dr. Loomis violated the Eighth Amendment because he knew of Todd's special "needs" but failed to meet those needs. Although they allege that Dr. Loomis visited Todd only a couple of times at Juvenile Hall, they admit that Dr. Loomis' subordinates completed a comprehensive mental health assessment on Todd. The Taylors allege that Dr. Loomis did not spend enough personal time with Todd. However, Dr. Loomis could delegate all of Todd's medical and psychiatric care to qualified subordinates without violating Todd's rights under the Eighth Amendment. The Taylors' allegation that Juvenile Hall did not meet Todd's special needs may be true; however, the Taylors fail to explain why Dr. Loomis personally should be held responsible for Juvenile Hall's inability to handle severely emotionally disturbed children with great needs like Todd.
 
 
 31
 As the record demonstrates, Todd's condition is not easily diagnosed and treated; the care of serious psychiatric and emotional problems is not a routine procedure governed by universally accepted standards. This is not a case where public officials failed to provide routine medical care like new dentures or a cast for a broken arm. Rather, it is a case where the care given Todd was insufficient to meet his great needs. The Taylors fail to set forth any commonly accepted psychiatric standards that Dr. Loomis and his subordinates violated. Under the Taylors' point of view, the individual doctors are strictly liable under the Eighth Amendment whenever they are unable to help a severely disturbed child with great emotional and psychiatric needs. According to the Taylors, the threshold for deliberate indifference is extremely low: doctors need not even be negligent to be deliberately indifferent; they are deliberately indifferent whenever the patient does not respond to treatment.
 
 
 32
 It is not clearly established law that a doctor may be held liable under the Eighth Amendment and § 1983 when a severely disturbed child does not respond to treatment. At a minimum, the Taylors must allege facts showing that Dr. Loomis violated accepted psychiatric standards for the treatment of a severely emotionally disturbed child and that the violation of these standards stemmed from deliberate indifference to Todd's psychiatric needs.
 
 
 33
 The Taylors essentially admit that there was little Dr. Loomis could do to meet Todd's needs while Todd was detained at Juvenile Hall. The Taylors' primary complaint is that Dr. Loomis showed deliberate indifference to Todd because Juvenile Hall did not meet Todd's needs and Dr. Loomis "did nothing to provide the environment Todd required." At bottom, the Taylors allege that Dr. Loomis violated Todd's Eighth Amendment rights by failing to find a residential placement for Todd. However, there is no support for the argument that the failure to provide Todd with a residential placement that would meet Todd's special needs violates the Eighth Amendment. Thus, it was not and is not clearly established law. As discussed above, the Taylors may pursue their IDEA claim against the Mental Health defendants for intentionally manipulating the IEP process to avoid an expensive residential placement that would meet Todd's needs. Unless Todd's medical care at Juvenile Hall clearly violated commonly accepted medical standards, however, it is not clearly established that the violation of Todd's IDEA rights is a violation of the Eighth Amendment.
 
 
 34
 In summary, the Taylors have not identified any specific conduct violative of a clearly established Eighth Amendment right. The Taylors simply make broad allegations that the Mental Health defendants were indifferent to Todd's needs without providing specific facts to support these allegations. Because the Taylors have not alleged conduct that violates clearly established Eighth Amendment rights, the Mental Health defendants are entitled to qualified immunity with respect to the Eighth Amendment claims.
 
 III. Due Process Claims
 
 35
 The Taylors allege that the Mental Health defendants violated several state statutes that prescribe the procedures to be used when a person is committed to a state institution. The Taylors argue that these procedural statutes not only protect a liberty interest but create substantive liberty interests themselves. According to the Taylors, any violation of these procedural statutes is a violation of the Due Process Clause. We disagree.
 
 
 36
 It is well established that a civil commitment is a deprivation of a liberty interest protected by the Due Process Clause. Vitek v. Jones, 445 U.S. 480, 491-92 (1980) (civil commitment deprives an individual of a liberty interest regardless of whether there is a state statute creating a liberty interest). However, the liberty interest protected is the interest in avoiding commitment, not the interest in any particular state procedure. Moreover, the procedures required by the Due Process Clause are a matter of federal law, regardless of whether the state has proscribed more protective or less protective procedures. Id. at 491. "[A]n expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause." Olim v. Wakinekona, 461 U.S. 238, 250 n. 12 (1983). Therefore, the due process issue in this case is not whether a state statute was violated, but whether the procedures followed satisfied the requirements of the Due Process Clause.
 
 
 37
 In the present case, the Taylors allege violations of state law, but they do not and could not allege that Todd was committed without notice and an opportunity for a hearing. See Reid v. Engen, 765 F.2d 1457, 1463 (9th Cir.1985) ("Procedural due process requires only adequate notice and an opportunity to be heard."). Before Todd was transferred to CSH, Todd received notice and a predeprivation hearing by a California state court judge. Approximately 30 days later, a full hearing was held in which Todd was represented by his own attorney and the Taylors appeared with their attorney. In this full postdeprivation hearing, all parties agreed to the full conservatorship with no change in Todd's hospitalization at CSH. Because the alleged violations of state procedural rights did not affect an underlying liberty interest, the Taylors have not alleged a violation of the Due Process Clause. See Dix v. County of Shasta, 963 F.2d 1296, 1299-1300 (9th Cir.1992) (state procedural rights are not liberty interests in themselves unless they mandate a particular result); see also Brandon v. District of Columbia Bd. of Parole, 823 F.2d 644, 648 (D.C.Cir.1987) ("Courts have explicitly and repeatedly rejected the proposition that an individual has an interest in a state-created procedural device, such as a hearing, that is entitled to constitutional due process protection.").
 
 
 38
 It is not and was not clearly established law that the violation of state procedural rights, without more, is a violation of the Due Process Clause. Therefore, the Taylors have failed to allege conduct that violates clearly established rights under the Due Process Clause, and the defendants are entitled to qualified immunity.
 
 CONCLUSION
 
 39
 The Taylors have alleged conduct that violates the clearly established IDEA right to a free and appropriate public education. Thus, the Mental Health defendants have no qualified immunity with respect to this IDEA claim, and the Taylors may pursue this claim. The Taylors other claims under the IDEA, the Eighth Amendment, and the Due Process Clause should be dismissed because the Taylors have failed to allege conduct that violates clearly established rights. For the reasons stated above, the decision of the district court is AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The Taylors also allege that Todd failed to receive related services while detained in Juvenile Hall. The Taylors allege that the Mental Health defendants "failed to convene expanded IEP team meetings to review Todd's IEP when he was not making reasonable progress." Again, if the Mental Health defendants intentionally sabotaged the IEP process to deny Todd his right to a free and appropriate public education, they violated clearly established law
 
 
 [2]
 Although the earlier removal of Todd from his nonresidential school and his detainment at Juvenile Hall was a change in placement under the reasoning in Honig, this earlier change in placement did not violate the IDEA. This change in placement was ordered by the Juvenile Court because Todd had attacked his family for the third time and had become so dangerous that the Taylors could not keep Todd in their home. Indeed, the Taylors participated in and urged Todd's removal from his nonresidential educational placement
 
 
 [3]
 The Taylors do not allege that Todd's probation officer failed to receive notice or failed to agree with Todd's transfer from Juvenile Hall