Daniel **FIELD** and David and Barbara Field, his parents, Plaintiffs,

v.

**HADDONFIELD BOARD OF EDUCATION, Defendant.**

**Civ. No. 90–2984 (MHC).**

United States District Court, D. New Jersey.

July 24, 1991.

Herbert D. Hinkle, Lawrenceville, N.J., for plaintiffs.

Capehart & Scatchard, P.A. by Joseph F. Betley, Mt. Laurel, N.J., for defendant.

## OPINION

GERRY, Chief Judge:

Plaintiffs filed this action under the Education for All Handicapped Children Act ("EHA"), 20 U.S.C. §§ 1400 *et seq., as amended by* The Handicapped Children's Protection Act ("HCPA"), 20 U.S.C. §§ 1415 *et seq.* (West 1990). In March of 1989, plaintiffs filed a petition with the New Jersey Department of Education seeking a hearing regarding the placement of their son, Daniel, in an appropriate special education program. As a result of these proceedings, as more fully detailed below, the parties entered into a settlement agreement. Pursuant to section 615(e)(4)(B) of the EHA, plaintiffs seek attorneys fees and costs as prevailing parties of those proceedings. Plaintiffs filed a second petition in March of 1990 for a determination of whether the defendant Haddonfield Board of Education ("the Board") was responsible for the cost of a substance abuse treatment program that Daniel attended. Pursuant to EHA section 615(e)(2), plaintiffs appeal the June 20, 1990 ruling of an Administrative Law Judge ("ALJ"), who held that the program was a "medical service" and, therefore, the responsibility of the parents.

Presently before the court are both parties' respective motions for summary judgment.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. The First Petition

A detailed account of the procedural history is required for proper resolution of these motions. During the 1988–89 school year Daniel was a tenth grade student who was classified as emotionally disturbed. In particular, Daniel has expressive and attention disorders, and has a tendency to become frustrated because of his inability to express himself and because of very low self esteem. See, P.App., at Pa3.[1] As an emotionally disturbed child, Daniel is eligible for free special education services. See, EHA §§ 602(17), (18); 614(a)(1)(C)(ii). Pursuant to Daniel's individualized educational program ("IEP"),[2] Daniel attended classes as a day student at the Alternative School in Cherry Hill, New Jersey for half a day, and the Haddonfield Memorial High School ("HMHS") for the other half. As a result of disciplinary and other problems encountered at the Alternative School, Daniel's parents sought to have Daniel enrolled full-time at HMHS. Although the Haddonfield child study team assigned to Daniel did not concur in plaintiffs' request, the parties agreed to allow Daniel to enroll full-time at the school. As a condition of enrollment, however, Daniel and his parents signed a "Performance Contract" which provided that Daniel would be suspended from the school and transferred to an alternative program outside the district if Daniel failed to comply with his performance requirements. D.App., at Ba13. This agreement was appended to Daniel's 1989 IEP.

On January 13, 1989, Daniel was suspended from HMHS as a result of an altercation he had with a teacher. At that time, the child study team recommended that Daniel be placed as a day student at the Yale School in Cherry Hill, a special education school for emotionally disturbed children. The Fields responded that they did not consider Yale appropriate because of the level of the program. D.App., at Ba21. Rather, after consulting with Dr. Leonard Krivy, an educational consultant, the Fields sought to have Daniel placed in a residential, twenty-four hour per day placement. For financial assistance in securing a residential placement, the Fields were referred to the New Jersey Division of Youth and Family Services ("DYFS"). The DYFS case manager responsible for the Fields' request met with the child study team and other high school staff members on February 28, 1989. On March 8, 1989, however, the DYFS informed Daniel's child study team that the Fields were apparently no longer interested in the services of that agency since the Fields did not contact them despite several requests to do so.

On March 6, 1989, the Fields filed a "due process" petition against the Board pursuant to 20 U.S.C. § 1415(b)(2) and N.J.Admin.Code section 6:28–2.7. See, P.App., at Pa2. The petition alleged four counts. Count I alleged that Daniel was improperly classified as emotionally disturbed and thus should be reclassified. Count II alleged that the homebound instruction that Daniel

---

1. Citations to "P.App." followed by the page number will refer to the plaintiffs' appendix submitted in support of their motion for summary judgment, and "D.App." followed by the page number will refer to the defendant's appendix submitted in opposition to plaintiffs' motion and in support of their motion for summary judgment.

2. An IEP is a written plan prepared for each handicapped child in a meeting with a representative of the local educational agency, the teacher, the parents or guardian and, where appropriate, the child. The statement must include a statement of the present levels of educational performance; annual goals, including short-term instructional objectives; specific educational services and the extent to which the child will be able to participate in regular educational programs; the projected date for initiation and expected duration of such services; and appropriate objective criteria and evaluation procedures for determining, on at least an annual basis, whether the instructional objectives are being achieved. 20 U.S.C. § 1401(19). The local educational agency must review and, where appropriate revise, each child's IEP at least annually. Id. § 1414(a)(5); see also, Board of Educ. v. Rowley, 458 U.S. 176, 181–82, 102 S.Ct. 3034, 3037–38, 73 L.Ed.2d 690 (1982).

was receiving was inadequate since less than five hours of instruction per week was provided in three out of the seven weeks that Daniel was homebound. Count II also alleged that Daniel's January 13, 1989 suspension was improper and requested that records of the suspension be expunged. Count III requested that Daniel be placed in a residential placement which plaintiffs felt was necessary "[b]ecause of [the Board's] long term failure to provide Daniel with an appropriate educational program that could enable him to overcome the effects of his learning disability, and because of the severity of the emotional problems this has caused Daniel...." P.App., at Pa6. Plaintiffs identified the Landmark School in Massachusetts as an appropriate seven day per week, twelve month per year, residential program. Finally, Count IV alleged that the Board never provided family counseling despite the previous IEP which provided for such counseling, and requested reimbursement for family counseling fees that had been incurred since 1985, estimated to be in excess of $5,000.

On March 28, 1989, the parties participated in a mediation session. The Board maintains that the "fountainhead" issues identified and discussed were Daniel's classification and residential placement. Because the parties were unable to resolve the dispute, a hearing was scheduled before Administrative Law Judge Bernard Goldberg pursuant to *N.J.Admin.Code* section 6:28–2.7(e)(4)(vi). Around this time, the Fields once again contacted the DYFS to see about getting Daniel placed in a residential placement by that agency. However, on May 10, 1989, the DYFS informed both parties of its determination that a residential placement was "not appropriate" for Daniel. *See,* D.App., at Ba40.

Prior to the administrative hearing, ALJ Goldberg indicated that he would only hear the issue of whether Daniel needed a residential placement, and not any dispute between the Board and DYFS over who should pay in the event that a residential placement was ordered. At the suggestion of ALJ Goldberg, the parties agreed to resolve the classification and placement issues by way of an independent evaluation by an independent child study team, with both parties being bound to the team's recommendations. *See* D.App., at Ba48. The Fields also reserved their right to pursue the remaining claims of expunction and reimbursement of counseling and attorneys fees until after the independent evaluation. The Cedar Hill Learning Disability Center ("Cedar Hill") was assigned to perform the evaluation.

On August 17, 1989, Cedar Hill issued its findings and recommendations based on a neuropsychiatric evaluation performed by David J. Gallina, M.D. The report concurred with the Haddonfield child study team's classification of Daniel as emotionally disturbed. Dr. Gallina also recommended a day program rather than a residential placement and specified particular areas that should be addressed to correct Daniel's condition. On August 28, 1989, the parties participated in an IEP conference to outline Daniel's special education program while a suitable placement was investigated. The parties agreed that homebound instruction would be provided while the search for a suitable day program proceeded.

Dr. Barbara Rell, Supervisor of Special Services for the Haddonfield School District, sent a draft of the IEP to the Fields for their review and signature. Dr. Rell noted that an appointment had been scheduled with the Yale School for the Fields to visit. The Fields signed the program, but made numerous revisions to the document, including a notation of the Fields' continued protest of Daniel's classification, a demand for a reading specialist, the development of a distributive education program, transitional counseling on an "as needed" basis rather than one session per week, and implementation of a behavior modification and recreational program while Daniel was on homebound instruction. D.App., at Ba110–17.

As a result of the Fields' modifications, on September 8, 1989, the Board requested a due process hearing with the Department of Education. On that same date, the

plaintiffs submitted an *ex parte* emergent relief application to Judge Goldberg, alleging that the Board was not providing tutoring to Daniel.[3] Judge Goldberg granted plaintiffs relief on September 13, 1989, and ordered the Board to provide ten to twenty hours of tutoring during normal school hours.[4] The Board intimates that Judge Golberg's order violated the Board's due process rights since they were not notified of the hearing, the order did not allow the Board to move for dissolution or modification of the order in violation of *N.J.Admin.Code* section 1:6A–12.1(d), there were no findings as to substantial likelihood of success or irreparable harm, and the order was not sent to all parties for purposes of raising objections as to its form within five days as provided in *N.J.Admin.Code* section 1:6A–12.1(f). However, the Board complied with the order and provided sufficient tutoring services. During this time, various day placement programs were being investigated in addition to the Yale School, including the Mill Creek School located on the grounds of the Institute of Pennsylvania Hospital.

At a settlement conference on September 27, 1989, placement at the Yale School appeared to be the most viable resolution. On October 11, 1989, however, the parties were informed that Daniel was denied admission to the Yale School. On October 13, 1989, after visiting the Mill Creek School, the Fields determined that that school was an acceptable placement, and Daniel was enrolled immediately.

After negotiation, the parties agreed to a consent order which, *inter alia,* provided that the Board would (1) place Daniel in the Mill Creek School, provide transportation, and incorporate the recommendations made by Cedar Hill into Daniel's program; (2) develop a distributive education program that incorporated Daniel's after-school employment; (3) provide reimbursement for SAT training; (4) provide Mr. and Mrs.

Fields with three sessions of counseling with Daniel; and (5) expunge Daniel's record of the January, 1989 suspension. P.App., at Pa20–21. Plaintiffs also reserved their right to seek attorneys fees. As far as the reimbursement for family counseling services, the parties agreed in a settlement conference to split the $5,000 evenly. A consent order was signed by the ALJ on November 13, 1989, and the $2,500 fee for counseling services was incorporated into the consent order in a written decision dated November 14, 1989.

### B.  The Second Petition

By February of 1990, Daniel's behavior at the Mill School was deteriorating. He was inattentive in class, verbally abusive to teachers, unmotivated, and doing poor academically. One day, Daniel was discovered showing a bottle of Valium to other students. The school immediately convened a "crisis meeting" with Daniel's parents. During that meeting, Daniel admitted taking the Valium from his mother, and also admitted to smoking marijuana and occasional drinking.

The possession of drugs on campus is grounds for automatic suspension from Mill Creek. Mill Creek advised both the Board and Daniel's parents that Daniel was expelled and that he would have to attend a residential substance abuse program in order to be readmitted to Mill Creek. Mill Creek recommended the Strecker program, also part of the Institute of Pennsylvania Hospital, and stated that Daniel could remain in school if he attended that program. Sandra Schoenholtz, assistant director of Mill Creek, opined that Daniel's possession of drugs may have been part of a larger problem, his emotional disturbance, and that his behavior and performance in school were linked together.

Plaintiffs asked the Board whether they would pay for the substance abuse pro-

---

3.  The parties dispute whether or not defendants received notice of this emergent application. Plaintiffs' counsel maintains that he spoke with an attorney at Capehart & Scatchard by telephone, yet defendant's counsel denies ever having received such notice.

4.  The Board contends that the reason it did not provide tutoring to Daniel was that Mrs. Field demanded that the tutoring be performed before 3:00 p.m., but that the Board could not find qualified teachers during these hours. *See* Defendant's Brief, at 13 n. 3.

gram at Strecker, and whether it wished to look at other programs. Dr. Rell responded with approval of the Strecker program, but indicated the Board's position that drug rehabilitation is considered a medical matter and, therefore, not the responsibility of school districts. *See,* P.App., at 190–91.

The Fields enrolled Daniel in the Strecker program at their expense. Although Mill Creek recommended a sixty day admission, Daniel attended Strecker for twenty-eight days, which exhausted his lifetime insurance benefits for psychiatric care. As a result of the Board's refusal to pay for the substance abuse program, the plaintiffs sought a hearing before the Department of Education. A hearing was conducted on May 7, 1990. After hearing testimony from Dr. Louis Pica, Jr., a psychologist and one of Daniel's counselors, Sandra Schoenholtz, Daniel's father and Dr. Rell, the ALJ determined that the care in question was medical in nature and thus not a school district responsibility.

## II. PLAINTIFFS' ENTITLEMENT TO ATTORNEYS' AND EXPERT FEES FOR THE FIRST PETITION

Under the EHA, federal funding for state special education programs is conditional on the state maintaining "a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). The EHA provides for parental notice of proposed changes to the IEP and for an opportunity to present complaints with respect to the child's IEP. *Id.* §§ 1415(b)(1)(C, E). Additionally, the parents or guardian have a right to "an impartial due process hearing which shall be conducted by the State educational agency," *id.* § 1415(b)(2), and state agency review of the due process hearing. *Id.* § 1415(c). Section 1415(e)(2) provides that any aggrieved party may appeal the final decision of the administrative process in either state or federal court.

### A. *Right of Prevailing Party to Maintain Action for Attorneys' Fees*

■ The EHA initially did not provide for the recovery of attorneys' fees. Ac-

cordingly, in *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), the Court held that plaintiffs who prevailed at the administrative level could not bring an independent action for attorneys fees. In response to *Smith,* Congress enacted the HCPA which provides in part:

> In any action or proceeding brought under this subsection, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents or guardian of a handicapped child or youth who is the prevailing party.

20 U.S.C. § 1415(e)(4)(B).

Notwithstanding this provision, the Board initially argues that plaintiffs are not entitled to attorneys fees for work performed at the administrative level, recognizing an apparent split of authority on this issue. In fact, of the many courts to address this issue, only two published opinions hold that a plaintiff may not bring an independent action for attorneys fees under the EHA. *Moore v. District of Columbia,* 886 F.2d 335 (D.C.Cir.1989) (*"Moore I"*), *vacated,* 907 F.2d 165 (D.C.Cir.) (*en banc*) (*"Moore I"*), *cert. denied,* —— U.S. ——, 111 S.Ct. 556, 112 L.Ed.2d 563 (1990); *Rollinson v. Biggs,* 660 F.Supp. 875 (D.Del. 1987). The *Rollinson* decision has been roundly criticized, and has been rejected by at least two courts in this district. *See, E.P. v. Union County Regional High School Dist. No. 1,* 741 F.Supp. 1144 (D.N.J.1990); *Chang v. Board of Educ. of Glen Ridge Township,* 685 F.Supp. 96 (D.N.J.1988). In an exhaustive opinion exploring the statutory scheme and legislative history of the EHA and HCPA, *Moore I* was vacated by the D.C. Circuit by a unanimous court sitting *en banc. Moore II,* 907 F.2d 165 (D.C.Cir.1990) (*en banc*). The Third Circuit, without analysis, has recognized the right to bring an action for attorneys fees in dicta in *Arons v. N.J. State Board of Educ.,* 842 F.2d 58, 62 (3d Cir.), *cert. denied,* 488 U.S. 942, 109 S.Ct. 366, 102 L.Ed.2d 356 (1988). Additionally, every federal circuit court to address the issue has concluded that a court may award attorneys fees to a parent who prevails in administrative proceedings. *See, e.g., Rapid City School Dist. 51/4 v.*

*Vahle,* 922 F.2d 476 (8th Cir.1990); *Moore II, supra; McSomebodies v. Burlingame Elementary School Dist.,* 897 F.2d 974 (9th Cir.1989); *Mitten v. Muscogee County School Dist.,* 877 F.2d 932 (11th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1117, 107 L.Ed.2d 1024 (1990); *Duane M. v. Orleans Parish School Board,* 861 F.2d 115 (5th Cir.1988); *Eggers v. Bullitt County School Dist.,* 854 F.2d 892 (6th Cir.1988). As it is by now all but undisputed that a federal cause of action for attorneys fees exists, we need not add to the much that has been written on the issue, and hold that plaintiffs' claim is authorized under the plain language of the EHA.

### B. *Are Plaintiffs Prevailing Parties?*

Defendant next contends that plaintiffs are not entitled to attorneys fees since they are not "prevailing parties" within the meaning of 20 U.S.C. section 1415(e)(4)(B). According to the Board, it is apparent that plaintiffs' main goal was to secure a residential placement for Daniel after he was suspended from HMHS. After the child study team recommended a day program such as the Yale school, plaintiffs filed the due process petition challenging this determination. Since the end result of the litigation was the affirmation of the child study team's initial recommendation of an out-of-district day placement (which was rejected by the Fields months before the due process petition was filed), the Board maintains that there was no material alteration of the legal relationship between the parties that justifies prevailing party status. Plaintiffs point out that, although they failed to secure a residential placement for Daniel, the "thrust" of the due process petition was to obtain an appropriate educational placement for Daniel. Additionally, plaintiffs were successful in getting (1) expunction of Daniel's records regarding his suspension; (2) partial reimbursement for the cost of family counselling; and (3) homebound instruction as a result of the emergent relief petition. *See,* Plaintiffs' Brief, at 24–26.

In enacting the HCPA, Congress intended that section 1415(e)(4)(B) be interpreted consistent with the fee shifting provisions under 42 U.S.C. section 1988. *See* S.Rep. No. 99–112, 99th Cong., 2d Sess., *reprinted in* 1986 *U.S.Code Cong. & Admin.News* 1798, 1803–05; *Shelly C. v. Venus Independent School Dist.,* 878 F.2d 862, 864 (5th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990); *Abu–Sahyun v. Palo Alto Unified School Dist.,* 843 F.2d 1250, 1252 (9th Cir.1988). Prior to the Supreme Court's decision in *Texas State Teachers Assn. v. Garland Independent School Dist.,* 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989), courts were split over the applicable test to be employed in determining whether or not a party "prevailed" in an action for purposes of awarding attorneys fees. While the majority of courts required that a party succeed on a significant issue and receive some of the relief sought in the lawsuit, *see, e.g., Fast v. School Dist.,* 728 F.2d 1030, 1032–33 (8th Cir.1984) (*en banc*), the Courts of Appeals for the Fifth and Eleventh Circuits applied a narrower test, requiring that a party succeed on the central issue in the litigation and achieve the primary relief sought. *See, e.g., Simien v. San Antonio,* 809 F.2d 255, 258 (5th Cir. 1987).

The Court in *Garland* adopted the former, "less demanding" test and noted that "the *degree* of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee, not to eligibility for a fee award at all." *Garland,* 489 U.S. at 790, 109 S.Ct. at 1492 (emphasis in original) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).

In reversing the court of appeals' use of the "central issue" test, the Court held that "[t]he touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Id.,* 489 U.S. at 792–93, 109 S.Ct. at 1493. In particular, "[i]f the plaintiff has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit,' the plaintiff has crossed the threshold to a fee award of

some kind." *Id.*, 489 U.S. at 791–92, 109 S.Ct. at 1493 (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978)). The Court reasoned that this approach is more in line with congressional intent, and that

> the search for the 'central' and 'tangential' issues in the lawsuit, or for the 'primary,' as opposed to the 'secondary,' relief sought, much like the search for the golden fleece, distracts the district court from the primary purposes behind [the fee shifting provision] and is essentially unhelpful in defining the term 'prevailing party.'

*Id.*, 489 U.S. at 791, 109 S.Ct. at 1493. In sum, to be a prevailing party, the plaintiff's success must be more than purely technical or *de minimis. Id.*, 489 U.S. at 792, 109 S.Ct. at 1493.

▪ Applying these principles to the facts of this case, we cannot conclude that the plaintiffs' success was *de minimis.* As indicated above, the Consent Order [5] of November 13, 1989 as supplemented on November 14, provided that the Board would incorporate the recommendations of Cedar Hill into Daniel's placement at Mill Creek; provide transportation to and from Mill Creek; develop a distributive education program that incorporated Daniel's after school employment; provide reim-

bursement for SAT training; provide Mr. and Mrs. Fields with family counseling; expunge Daniel's record of the January, 1989 suspension; and partially reimburse the Fields for family counseling services previously incurred. *See* page 1318, *supra.* We agree with the Board that plaintiffs' primary motivation in pursuing the due process petition was most likely to seek a residential placement for Daniel. Similarly, we do not doubt that much of the relief consented to by the Board was done "in the give-and-take of negotiations and in the best interests of Daniel...." Defendant's Brief at 15. However, as *Garland* makes clear, prevailing party status cannot hinge on the subjective importance of a particular issue to the litigants. *Id.*, 489 U.S. at 791, 109 S.Ct. at 1492–93. The status of Daniel's *placement* may not have been altered as a result of the administrative proceedings, a (if not *the*) primary concern of the Fields. Yet, as indicated by the breadth of relief agreed to in the Consent Order, we find that the litigation did result in a material alteration of the legal relationship of the parties. The issues that were resolved in the Fields' favor, while perhaps less important (from plaintiffs' perspective) than the placement issue, were nonetheless "significant" and surely resulted in some of the benefit which the plaintiffs sought by bringing the lawsuit.[6]

---

**5.** The fact that the parties entered into a settlement agreement does not preclude an award of attorneys fees. *Shelly C. v. Venus Independent School Dist.*, 878 F.2d 862 (5th Cir.1989).

**6.** "The standard in this circuit for determining whether the litigation is causally related to the relief obtained ... [is] whether the litigation 'constituted a material contributing factor in bringing about the events that resulted in the obtaining of the desired relief.'" *Institutionalized Juveniles v. Secretary of Pub. Welfare*, 758 F.2d 897, 916 (3d Cir.1985) (quoting *Sullivan v. Commonwealth of Pa. Dep't of Labor and Industry*, 663 F.2d 443, 452 (3d Cir.1981)). A comparison of plaintiffs' requested relief in the due process petition with the provisions of the Consent Order make clear that plaintiffs have satisfied this standard. Plaintiffs' petition states:
WHEREFORE, Petitioners demand judgment from Respondent on all Counts for the following:
(a) *An order finding that Daniel is entitled to a free appropriate public education at Respondent's expense and that such a program*

*must be designed to enable Daniel to overcome the effects of his learning disabilities* and that the program must operate on the college preparatory level;
(b) An order finding that the program that Daniel requires must be available on a residential basis, twelve months a year;
(c) An order directing Respondent to place Daniel immediately into the Landmark School or in another suitable [residential] program;
(d) *An order directing that Respondent bear all of the costs of Daniel's educational placement, including all of Petitioners' educationally necessary transportation expenses;*
(e) *An order requiring Respondent to expunge from Daniel's records all evidence of any suspensions that were not made in conformity with law;*
(f) *An order requiring Respondent to reimburse Petitioners for the cost of counselling as identified in this Petition;*
....
P.App., at Pa7–8. Plaintiffs were at least partially successful in each of the emphasized provi-

## 1322

### C. *Reasonableness of the Fees*

■ Our determination that plaintiffs are "prevailing parties" entitling them to attorneys fees under the HCPA does not end our inquiry, however, as we must determine the amount of reasonable attorneys fees to which plaintiffs are entitled. Plaintiffs request a total of $20,341.00 in attorneys fees, expert fees and costs, and have provided the court with a fee certification in support of their request. Plaintiffs request $9,510.00 in counsel fees and costs and $3,602.00 in expert fees for services pertaining to the first due process petition; $6,254.00 in counsel fees and costs and $300.00 in expert fees for services pertaining to the Strecker program petition; and $675.00 for counsel fees and costs for "work·that can be allocated fully to either matter." Because the plaintiffs' success was limited, however, any fee award must be reduced under the principles announced in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

■ The Court in *Hensley* set forth the framework for determining the amount of reasonable attorneys fees to be awarded in § 1988 cases which, as indicated above, is the analysis used in EHA cases. Where a plaintiff presents different claims for relief that are based on unrelated facts and legal theories, courts should exclude fees for time expended in unsuccessful claims. *Id.*, 461 U.S. at 434–35, 103 S.Ct. at 1939–40. However, where "[m]uch of counsel's time ... [was] devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis[,] ... the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the liti-

gation." *Id.* at 435, 103 S.Ct. at 1940. Where, as here, the plaintiff has achieved only partial success, a lodestar calculation of attorneys fees may result in an excessive amount.[7] *Id.* at 436, 103 S.Ct. at 1941. "Again, the most critical factor is the degree of success obtained." *Id.* In exercising its discretion in fixing the award, "[t]he district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Id.* at 436–37, 103 S.Ct. at 1941.

Clearly, the litigation stemming from the plaintiffs' initial administrative petition is distinct enough from the second petition (for reimbursement of the cost of the Strecker program) such that these two "claims" warrant separate treatment.[8] Whether or not the several claims asserted in the first petition should be considered related is less clear. "One useful 'starting point' for separating an *un* related, unsuccessful claim from a related unsuccessful claim is to determine whether a particular unsuccessful claim shares a 'common core of facts' with the successful claim or is based on a 'related legal theory.' " *W. Va. University Hospitals, Inc. v. Casey*, 898 F.2d 357, 361 (3d Cir.1990) (quoting *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940)) (emphasis in original). As indicated above, under the settlement agreement plaintiffs were "successful" in requiring the Board to bear the cost of an appropriate special education program including transportation expenses, expunging Daniel's records of the January, 1989 suspension, and in partially reimbursing the Fields' for counselling. However, plaintiffs were unsuccessful in their attempt to have Daniel reclassified and placed in a residential program at the Board's expense. Immediately after

---

sions. *Compare,* P.App., at Pa. 20–21 (consent order of November 13, 1989); *see* page 1318, *supra.*

7. In contrast, where the plaintiff has achieved "excellent" results, the court should not reduce an award of attorneys fees simply because plaintiff did not prevail as to all claims. *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. Although the terms "limited success" and "excellent result" are "unavoidably ambiguous," *Davis v. Southeastern Pa. Transp. Authority,* 924 F.2d 51,

55 (3d Cir.1991), it is clear that plaintiffs achieved only limited success in light of their failure to secure a residential placement or to have Daniel reclassified. Plaintiffs, in any event, have not contended that they achieved "excellent results" within the meaning of *Hensley.*

8. As for the latter, plaintiffs were unsuccessful parties below and as discussed *infra,* we affirm this determination.

Daniel's suspension, the Fields retained a consultant who recommended various residential programs. Shortly thereafter, the Fields contacted the DYFS and initiated the first due process petition seeking a residential placement. Although the petition sought broader relief, some of which was obtained in the Consent Order, the ALJ focussed on the placement and classification issues. Accordingly, it appears to us that these issues were of paramount importance to the Fields, and required at least as much preparation and effort as the remaining issues.

We are unable to exclude, claim by claim, services for which plaintiffs were successful and those for which plaintiffs were unsuccessful.[9] Plaintiffs' fee certification, while it details the type of service rendered, e.g., "telephone call to client," "meeting," etc., does not indicate the subject matter of the service in any detail other than to specify whether it pertained to the "first matter," the "second matter" or to both matters. While we are unable to make an item-by-item analysis, we note that certain relief obtained by plaintiffs, such as expunction of Daniel's suspension records, required little expenditure of time. Rather, at a minimum, at least as much time was expended by the parties in resolving the issue of Daniel's placement as was spent resolving the remaining issues. No doubt, however, plaintiffs' efforts in seeking a residential placement furthered their attainment of relief in the other areas agreed to in the Consent Order. Accordingly, considering the record before us we conclude that a reduction of 50% of plaintiffs' gross lodestar calculation represents reasonable attorneys fees for the litigation stemming from the first petition, considering the significance of the overall relief obtained by the plaintiffs in relation to the hours reasonably expended on the litigation.[10]

### D. *Allowance of Expert Fees*

■ The Board argues that plaintiffs are not entitled to expert fees since expert fees beyond the thirty dollar per day limit set forth in 28 U.S.C. section 1821(b) are not recoverable as part of an attorneys fee award under § 1988. *See, W. Va. University Hospitals, Inc. v. Casey*, 885 F.2d 11 (3d Cir.1989), *aff'd*, — U.S. —, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). Although the Court in *Casey* held that expert fees were not recoverable in actions under § 1988, in a footnote Justice Scalia observed that the HCPA (which was not at issue in that case), in including "reasonable attorneys' fees as part of the costs," 20 U.S.C. § 1415(e)(4)(B), apparently departed from the ordinary meaning of "attorneys' fees" by allowing expert fees. *Id.*, 111 S.Ct. at 1143 n. 5. At the time the HCPA went to conference, the Senate bill provided for fees "in addition to the costs," which the conferees changed to "fees as part of the costs." *See, Moore I, supra*, 886 F.2d at 347. The conferees explained: "The conferees intend that the term 'attorneys' fees as part of the costs' include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the parent or guardian's case in the action or proceeding, as well as traditional costs incurred in the course of litigating a case." *H.R.Conf.Rep. No.* 687, 99th Cong., 2d Sess. 5, *reprinted in*, 1986 *U.S.Code Cong. & Admin.News* 1798, 1808; *see also, Arons, supra*, 842 F.2d at 62. Thus, unlike § 1988, Congress intended that expert fees be included "as part of the costs" allowable under section 1415(e)(4)(B).

■ It would be anomalous, however, to reduce the award of attorneys fees under *Hensley* in light of the plaintiffs' limited success in the administrative forum, yet require defendant to reimburse plaintiffs 100% of their not insignificant expert fees.

---

**9.** Plaintiffs' contention that there should be *no* fee reduction since the issues were intertwined is disingenuous, since plaintiffs ignore the fact that they achieved only limited success in the administrative forum.

**10.** As to the $675.00 for services plaintiffs aver can be allocated fully to either matter, we will allocate 50% of this sum to the first petition and reduce this amount ($337.50) by 50% under *Hensley*.

We feel that the rationale of *Hensley* is equally applicable in this regard, particularly since expert fees are to be treated as "part of the costs." Accordingly, we will reduce plaintiffs' requested expert fees by a factor of 50% to reflect the limited relief obtained by plaintiffs in relation to the hours reasonably expended on the litigation.

### III. THE SECOND PETITION

Plaintiffs base their appeal of the ALJ decision denying them reimbursement for Daniel's placement in the Strecker program on both procedural and substantive grounds. While the EHA provides minimal substantive educational requirements for handicapped children, it primarily establishes detailed procedural requirements to "assure that all handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, [and] to assure that the rights of handicapped children and their parents or guardians are protected...." 20 U.S.C. § 1400(c).

After a hearing conducted on May 7, 1990, Administrative Law Judge Bruce R. Campbell determined that the Strecker substance abuse program was medical in nature and, therefore, not the Board's responsibility. The EHA authorizes appeals of an ALJ's determination, and provides that the reviewing court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court deems appropriate." 20 U.S.C. § 1415(e)(2). This provision, however,

> is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. The fact that § 1415(e) requires that reviewing court 'receive the records of the

[state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings.

*Board of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). The Court in *Rowley* held that

> a court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the [IEP] developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Id.*, 458 U.S. at 206–07, 102 S.Ct. at 3051 (footnotes omitted).

#### A. *Procedural Challenge*

■ Plaintiffs' procedural challenge revolves around the Board's response to Daniel's expulsion from the Mill Creek program. As indicated above, Mill Creek determined that Daniel must be placed in a substance abuse program in order for him to be able to return to Mill Creek. The team concluded that the substance abuse rehabilitation program was medical in nature and, therefore, was not a school district responsibility. Dr. Rell testified that there was a practice to never recommend services which cost money without first obtaining approval from the superintendent, and that she had discussed the cost of the Strecker program with the superintendent before advising the family that the Board would not pay for the program. *See* Transcript of May 7, 1990 Administrative Proceeding ("T.") 230–31. Plaintiffs maintain that the EHA's procedural requirements were disregarded when the child study team held an informal meeting after Daniel was expelled without performing an evaluation and developing a new IEP. Moreover, plaintiffs contend, the family was not notified of the informal meeting. *See* T.237–40 (testimony of Dr. Rell). Further, plaintiffs contend that any plan can be vetoed on financial grounds in secret by

the superintendent, and that this is what appears to be what happened in the Fields' case.

The Board maintains that plaintiffs are barred from asserting a procedural challenge to the Board's decision since plaintiffs never raised any procedural objections in the initial due process petition, the issue was never argued at the administrative hearing and is raised for the first time in this motion, citing *David D. v. Dartmouth School Committee*, 775 F.2d 411 (1st Cir. 1985), *cert. denied sub nom. Mass. Dep't of Educ. v. David D.*, 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986), and *Colin K. by John K. v. Schmidt*, 715 F.2d 1 (1st Cir.1983). Moreover, the Board denies that it violated any procedural guaranties.

■■■ Because the district court's review of an administrative hearing in actions under the EHA is short of *de novo*, failure to raise an issue at the administrative level may result in a waiver of that issue in a subsequent action. *See, e.g., David D.*, 775 F.2d at 424. Plaintiffs contend that the procedural issues were raised in the due process petition, and that substantial testimony was taken on the issue, although the substantive claims were emphasized by the ALJ. *See* D.App., at Ba155 (due process petition which states that "Haddonfield's supervisor of special services rejected this request [for a substance abuse program] on February 12th ... [and] [t]he child study team was never involved in this decision").

Even assuming that plaintiffs preserved their right to assert the alleged procedural violations, we agree with the Board that there was no procedural violation in this case. Had Daniel not enrolled in a substance abuse program, the Board would have been obligated to secure a new placement and develop a new IEP given Daniel's expulsion from Mill Creek. Indeed, Dr.

Rell acknowledged the child study team's obligation in this instance. *See*, T.249–50. Significantly, however, the Fields enrolled Daniel in the Strecker program after corresponding with the Board. Although the Fields disputed the Board's decision not to pay for the program, the Strecker program was selected in part because it was integrated with Mill Creek and enabled Daniel to remain at the school without interruption. Accordingly, since there was no significant change in placement, the child study team was not obligated to reevaluate Daniel or prepare a new IEP. *See, N.J.Admin.Code* § 6:28–3.7(a)(4), (5); *see also*, 20 U.S.C. § 1415(b)(1)(C)(ii) (prior notice must be given to parents whenever agency "refuses to initiate or change, the ... educational placement of the child ...").

### B. *The Strecker Program and the "Medical Services" Exclusion*

■■■ The core issue presented by plaintiffs' appeal of the second due process petition is whether Daniel's placement in the Strecker substance abuse program was a "related service" or rather whether the program was an excluded "medical service."[11] A "free appropriate public education" to which Daniel is entitled includes special education and related services. 20 U.S.C. § 1401(18). "Related services" are defined as:

> transportation, and such developmental, corrective, and other supportive services (*including* speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and *medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only*) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children.

**11.** Plaintiffs initially contend that Daniel should have been placed in a residential program pursuant to 34 C.F.R. § 300.302 (1991). *See* Plaintiffs' Brief, at 12–14. However, plaintiffs merely attempt to relitigate the issue which has already been resolved by the parties by the initial due process petition and ultimately by the Consent Order. The issue is not whether the Strecker program is a special education program, but, as discussed below, whether the program provided non-diagnostic and non-evaluative medical services.

*Id.* § 1401(17) (emphasis added).[12] Under the regulations, medical services which must be provided by the school district are those "services provided by a licensed physician to determine a child's medically related handicapping condition which results in the child's need for special education and related services." 34 C.F.R. § 300.13(b)(4) (1990).[13]

Where a child's education is adversely affected by substance abuse, successful completion of a substance abuse program can be expected to increase the effectiveness of the child's educational program. In this case, after being found possessing Valium and admitting to drinking alcohol and smoking marijuana, Daniel's expulsion from Mill Creek appeared to be based on several related grounds. Daniel's advisor, Sandra Shoenholtz who is an assistant director at Mill Creek, testified that one of Mill Creek's "cardinal rules" was that possession of drugs was grounds for automatic expulsion. T.157–58. Moreover, Ms. Schoenholtz testified that a student's drug use is usually a manifestation of a deeper emotional or social problem. Thus, she testified, "in our experience, a student who would break a rule like that [possession of drugs on school premises] ... [is] really in need of more help then we [are] able to provide." T.158; *see also,* T.167 ("I feel that a student who manages to get themselves thrown out of our school generally needs more intensive treatment then what we can provide in the day program"). In fact, after Daniel completed the Strecker program, he initially demonstrated improved behavior in school.[14]

However, the fact that a particular program may benefit a classified child's special education program clearly does not *ipso facto* compel the conclusion that that program is a "related service" and thus a school district responsibility under the EHA. For example, courts have held that psychiatric treatment geared to combat mental illness is an excluded medical service although the treatment may be related to education in the sense that the child cannot fully benefit from his or her education without it. *See, e.g., Clovis Unified School Dist. v. Cal. Office of Admin. Hearings,* 903 F.2d 635, 642 (9th Cir.1990); *Doe v. Anrig,* 651 F.Supp. 424 (D.Mass. 1987); *cf. T.G. v. Board of Educ.,* 576 F.Supp. 420, 424 (D.N.J.1983), *aff'd without op.,* 738 F.2d 420 (3d Cir.1984), *cert. denied,* 469 U.S. 1086, 105 S.Ct. 592, 83 L.Ed.2d 701 (1984) (psychotherapy received by emotionally disturbed child was akin to psychological counselling and thus was a related service).

In *Irving Independent School Dist. v. Tatro,* 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984), the Supreme Court noted that the definition of "medical services" in the EHA evinced Congress' desire "to spare schools from an obligation to provide a service that might well prove unduly expensive and beyond the range of their competence." *Id.* at 892, 104 S.Ct. at 3377 (footnote omitted). The Court held that a school district must provide intermittent catheterization to an eight year old girl who, due to a neurogenic bladder, required the procedure every three to four hours to avoid injury to her kidneys. Because the procedure was a simple one that could be performed in a few minutes by a layperson with less than an hour's training, it could be required to be performed by school nursing services. This contrasted with far more expensive procedures required of a physician or hospital and which was meant

---

**12.** The Board does not suggest that the Strecker program is not a "supported service." For present purposes, since Mill Creek has determined that Daniel could not benefit from its program without addressing his alleged substance abuse problem, we assume that a substance abuse program constitutes a supportive service.

**13.** *See Irving Independent School District v. Tatro,* 468 U.S. 883, 892 n. 10, 104 S.Ct. 3371, 3377 n. 10, 82 L.Ed.2d 664 (1984) (although the regu-

lations ostensibly provide a general definition of medical services, presumably the Secretary of Education actually meant medical services *not* owed by the school district).

**14.** After the first week, however, Daniel's behavior deteriorated until Mill Creek developed and implemented a new behavioral plan to get Daniel to control his anger and the way he deals with people. T.178–79.

to be excluded under the EHA. *Id.* at 893, 104 S.Ct. at 3377.

Although we have found no case on point dealing with a substance abuse program, we conclude under the facts of this case that the services performed at the Strecker program constitute medical services for which the plaintiffs must bear the cost under the EHA. According to the hospital brochure that describes the Strecker program, the program operates under the recognition that drug dependency is a disease, and treatment is geared with this in mind. P.App., at Pa139. The brochure describes the procedures which all patients are given upon admission:

> * a complete medical evaluation by a specialist in internal medicine
> * a psychosocial assessment of the patient's home environment that focuses on family, friends and work factors
> * a diagnostic assessment by a psychiatrist who becomes the patient's private, attending physician, and continues to work with him or her on a daily basis throughout the treatment process. Upon discharge, patients can continue seeing the Institute psychiatrist as an outpatient, ...
>
> The Strecker Program also provides skilled medical services for detoxification, and for clinical management of other physical or emotional problems, if needed.

*Id.* at Pa140.

We must disagree with plaintiffs' contention that the Board's responsibility for the Strecker program turns on whether the services can be provided by persons other than licensed physicians. *See* Plaintiffs' Brief, at 22. *Tatro* does not require so much. "[A] program clearly aimed at curing an illness—whether mental or physical—does not become instantly 'related' when it can be implemented by persons other than licensed physicians." *Clovis*, 903 F.2d at 643; *accord, Tice v. Botetourt County School Board*, 908 F.2d 1200, 1209

n. 13 (4th Cir.1990) ("[t]his determination necessarily must turn on the nature and purpose of the services rather than the identity of the service provider"); *Detsel v. Board of Educ.*, 637 F.Supp. 1022 (N.D.N.Y.1986), *aff'd*, 820 F.2d 587 (2d Cir.), *cert. denied*, 484 U.S. 981, 108 S.Ct. 495, 98 L.Ed.2d 494 (1987) (life support services necessary to maintain child in school are medical services despite the fact that the services could be provided by a nurse rather than a licensed physician).

Moreover, although Mill Creek may have "required" Daniel to attend a substance abuse program as a condition for his continued enrollment at the school, this is not to say that a substance abuse program was "required to assist the child to benefit from special education." 20 U.S.C. § 1401(17); *see, Anrig*, 651 F.Supp. at 431. Although the Strecker program addressed some of Daniel's emotional problems as a "dual diagnosis" program,[15] the testimony and records reveal that the program provided intensive therapy for Daniel's underlying psychiatric disorders, which included psychiatric counselling, numerous physical evaluations as well as medication.[16] *See*, P.App., at Pa41–134 (Strecker medical records); T.190 (testimony of Ms. Schoenholtz). Strecker provided medical treatment which Mill Creek could not, as an educational institution, provide. *See*, T.190–91. Significantly, in developing a treatment program, each patient is assigned a treating physician, in Daniel's case Dr. Michael McCarthy. *See* P.App. Pa43, 140. *Compare Taylor v. Honig*, 910 F.2d 627 (9th Cir.1990) (residential program was "related service" where handicapped child's program developed through IEP by the school system), *with Clovis*, 903 F.2d at 644–45 (residential program was excluded "medical service" where handicapped child's program developed by a medical team supervised by a licensed physician).

---

15. *See* T.172 ("It's [Strecker] a dual-diagnosis program, meaning that the adolescents who come into the program are viewed as people who have a substance abuse problem, but also other psychiatric problems").

16. Daniel was prescribed up to 1,200 mg of lithium carbonate per day. *See*, P.App., at Pa53 (report of Michael McCarthy, M.D.).

The "[a]nalysis ... focus[es] ... on whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process." *Kruelle v. New Castle County School Dist.*, 642 F.2d 687, 693 (3d Cir.1981). Here, Strecker provided treatment which was clearly "segregable," from, though beneficial to, Daniel's learning process. For instance, although Mill Creek's educational program was integrated with the Strecker program, Mill Creek personnel is not involved in the patient's daily therapy sessions conducted by the psychiatrist, nor other group sessions such as Alcoholics Anonymous and Narcotics Anonymous. Ms. Schoenholtz testified:

A. [T]he only meetings teachers are involved in are called team meetings. There's one team meeting where a teacher meets to basically communicate with the rest of the treatment team.

There's another team meeting where all the team members meet with the patients to talk about privilege level changes, and what's happening in their total program.

Q. Are the teachers involved at all in the actual treatment given at Strecker?

A. No, other than the educational part of the program.

Q. Educational part of the Strecker program?

A. Right.

T.197.

Although school districts are not required to pay for non-diagnostic or non-evaluative medical services, the school must provide educational services to students who are confined to a hospital. 20 U.S.C. § 1401(16). Strecker's standard billing policy is consistent with this requirement. The patient is billed for the treatment administered at Strecker while the school district is separately billed for the educational component offered through Mill Creek (for those patients who, like Daniel, were enrolled in Mill Creek). *Id.* In fact, the Board continued to pay for Daniel's enrollment at Mill Creek while he was in the Strecker program. Mill Creek's practice has always been to bill the parents for all clinical programs at the hospital that are inpatient programs, such as Strecker, and to bill the school district for the educational portion provided by Mill Creek. *Id.*, at 198. This practice is harmonious with the EHA's requirements.

We also note that the medical services provided Daniel by the Strecker program are not within the exception provided in the EHA for services "provided by a licensed physician to determine a child's medically related handicapping condition which results in the child's need for special education and related services." 34 C.F.R. § 300.13(b)(4). *See* note 13, *supra*. Here, Daniel was placed in the Strecker program for treatment rather than to determine his need for educational or related services.

Finally, we note that our conclusion is not inconsistent with the Department of Education's Policy letter of April 18, 1988. In that advisory opinion, an inquiry was made as to a school district's responsibility for a child who becomes handicapped as a result of drug addiction. The Office of Special Education Programs had previously determined that addiction itself is not considered to be a handicapping condition covered by the EHA. The Secretary responded that

[i]f a residential program is necessary to provide FAPE [a fair appropriate public education] then it must be made available. If a child is addicted and handicapped, public agencies are only required to provide the aspects of the child's program that would enable the child to receive FAPE. If a service is required solely to treat the child's addiction and is not required to provide FAPE, then the public agency is not required to provide the service or to provide it at no cost.

213 E.H.L.R. 133–34 (Supp.1988). The Board has fulfilled its obligation under the EHA by providing for Daniel's education through the Mill Creek program. However, the Fields must pay for Daniel's enrollment in the Strecker program since we find that that program renders medical services within the meaning of 20 U.S.C. sec-

tion 1401(17). Accordingly, we will affirm the ALJ's determination.

## IV. CONCLUSION

For the reasons set forth above, we find that the Board must reimburse plaintiffs for 50% of their attorneys fees and expert costs for litigation pertaining to the first petition, as set forth in counsel's certification and as more fully set forth in the accompanying Order. As to Daniel's placement in the Strecker program, we find that this program rendered medical services which were not for diagnostic or evaluation purposes and, therefore, the ALJ's decision will be affirmed.

The accompanying Order will be filed this day.

## ORDER

This matter, having come before the court on a motion for summary judgment by plaintiffs, Daniel Field and David and Barbara Field, his parents, and on a cross-motion for summary judgment by defendant, Haddonfield Board of Education;

For the reasons set forth in the court's opinion filed this day; and

For good cause shown;

It is on this 24th day of July, 1991

ORDERED that plaintiffs' motion for summary judgment on their claim for attorneys fees be and hereby is GRANTED IN PART and that defendant shall pay to plaintiffs reasonable attorneys fees and costs of $4,923.75 and expert fees of $1,801.00 for administrative proceedings arising out of plaintiffs' initial due process petition filed with the New Jersey Department of Education on March 6, 1989. Said figure was calculated as follows: ($9,510.00 × 50%) + (($675.00/2) × 50%) + ($3,602.00 × 50%); and

The court having concluded that the Strecker program of the Institute of Pennsylvania Hospital rendered medical services to plaintiff Daniel Field which were not for diagnostic or evaluation purposes, it is therefore ORDERED that

(1) Plaintiffs' motion for summary judgment on their claim for reimbursement of the cost of Daniel's placement in the Strecker program be and hereby is DENIED; and

(2) Defendant's crossmotion for summary judgment on said claim be and hereby is GRANTED; and

(3) The decision of the Administrative Law Judge dated June 20, 1990 in OAL DKT. No. EDS 2632–90 be and hereby is AFFIRMED; and

(4) Plaintiffs shall be responsible for the cost of Daniel's placement in the Strecker program.